[No. C007401. Third Dist. Sept. 25, 1991.]

FEDERICO S. AGUIMATANG, JR., Plaintiff and Appellant, v.
CALIFORNIA STATE LOTTERY et al., Defendants, Cross-defendants and
Respondents;
ARNULFO MELGAR CHANQUIN, Defendant, Cross-complainant and
Appellant.

770

COUNSEL

Rentzer & Rentzer, Robert D. Rentzer and Philip C. Greenwald for Plaintiff and Appellant.

Elaine Buhan, Judith P. Blinco and Arthur Azdair for Defendant, Cross-complainant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, N. Eugene Hill, Assistant Attorney General, Cathy A. Neff and Linda A. Cabatic, Deputy Attorneys General, for Defendants, Cross-defendants and Respondents.

OPINION

SIMS, J.—Plaintiff Federico S. Aguimatang, Jr., and cross-complainant Arnulfo Melgar Chanquin appeal from summary judgment entered in favor of defendants/cross-defendants California State Lottery Commission, State

Controller, Director of California State Lottery, California State Lottery, State of California, James Barnett, Timothy Ford and California State Lottery Education Fund (collectively State Lottery).[1] The litigation involves appellants' claims under the California State Lottery Act of 1984 (Cal. Const., art. IV, § 19, subd. (d);[2] Gov. Code, § 8880 et seq.[3]) that they, as holders of winning "California Lotto 6/49" tickets, were deprived of a portion of their winnings when the State Lottery divided a $15.9 million Lotto jackpot into four shares, with one unclaimed share reverting to the Education Fund, rather than dividing the jackpot equally between the three persons who came forward with winning tickets.[4] The State Lottery prevailed on a motion for summary judgment by showing its computer records indicated four winning transactions. Appellants attempted to raise a triable issue as to whether the fourth transaction was an aborted wager for which no valid ticket ever issued. The trial court concluded it was immaterial whether a valid fourth ticket ever issued.

 ██ Appellants contend (1) the jackpot should be divided by the number of winning tickets presented; (2) the statutory reversion of unclaimed prizes to the Education Fund does not apply to annuitized prizes; (3) issuance of a ticket is required in order to create a prize, and a triable issue of material fact exists as to whether a fourth ticket issued; (4) the trial court erroneously presumed that if the lottery's computer shows an uncancelled wager, a valid ticket has been issued; (5) the trial court considered inadmissible evidence; and (6) the trial court improperly denied a continuance and foreclosed discovery.[5]

---

[1] The State Board of Control was a named cross-defendant but was dismissed with prejudice following demurrer in May 1989.

[2] California Constitution, article IV, section 19 provides in part: "(a) The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State. [] [¶] (d) Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery."

[3] Undesignated statutory references are to the Government Code.

[4] The third person, Robert Earl Jorgenson, was joined as a necessary party in the complaint and cross-complaint but failed to answer; his default was taken, and he is not a party to this appeal.

[5] In a footnote, Aguimatang's brief also asks this court to direct the trial court to vacate a May 1989 order imposing $523.50 monetary sanctions against each of his two attorneys in connection with a motion to recuse defense counsel. However, at the time, the order was appealable but no appeal was taken from the order and it is now final. (See I. J. Weinrot & Son, Inc. v. Jackson (1985) 40 Cal.3d 327, 331 [220 Cal.Rptr. 103, 708 P.2d 682]; Bauguess v. Paine (1978) 22 Cal.3d 626, 634, fn. 3 [150 Cal.Rptr. 461, 586 P.2d 942] [order imposing sanctions against attorney is appealable as final order on collateral matter]; compare Code Civ. Proc., § 904.1, subd. (k), enacted following all proceedings in the trial court; Stats. 1989, ch. 1416, § 25.) Aguimatang's appellate brief nevertheless seeks review, citing the court's inherent power to correct rulings and claiming events subsequent to the ruling prove the recusal motion was not frivolous. However, the cited authority refers only to a trial court's

We will conclude (1) assuming four winning wagers, the method of division of the jackpot and reversion of the unclaimed share to education complied with the statutes; (2) the issuance of a ticket is material to the determination of a winning wager and the creation of a "prize"; and (3) the trial court abused its discretion in denying a continuance to allow further discovery, based on its conclusion that issuance of a fourth ticket was immaterial. We will therefore reverse the judgment and remand to the trial court for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

In January 1988, Aguimatang filed a complaint for breach of contract and conversion, alleging he was one of three winning claimants entitled to share a $15.9 million Lotto jackpot but that the State Lottery awarded him only one-fourth of the jackpot. An amended complaint alleged the State Lottery's identification of four winners and set forth Aguimatang's theory that a Lotto jackpot must be divided by the number of claimants who come forward with valid tickets, not by the number of winners reflected in the State Lottery's computer. The misrepresentation cause of action alleged the State Lottery falsely represented that four winning tickets were presented. Aguimatang thus claimed the State Lottery had deprived him of his entitlement by transferring the fourth, unclaimed share to the Education Fund. Aguimatang claimed entitlement to the entire fourth share and therefore joined as necessary parties the Education Fund and the other winning claimants, Chanquin and Jorgenson.

In January 1989, Chanquin filed a cross-complaint which was premised on the same theory as the complaint but also added allegations that no fourth ticket ever issued.

At the demurrer stage, the trial court ruled that no cause of action was stated on the basis that there were only three claimants for the prize; division of the jackpot by the number of winning wagers, with reversion of the unclaimed share to education, conformed to the governing statutes. However, the court ruled a cause of action could be stated on the theory that the fourth ticket either never issued or was cancelled.

Amended pleadings were filed.

Aguimatang's second amended complaint asserts causes of action for breach of contract, declaratory relief, breach of statutory duty, conversion,

jurisdiction to reconsider its own rulings. (*Greenberg* v. *Superior Court* (1982) 131 Cal.App.3d 441, 445 [182 Cal.Rptr. 466].) Moreover, subsequent events are immaterial, since sanctions were imposed not for a frivolous motion but for violation of local rules. Accordingly, we reject the request to review the order imposing sanctions.

and negligent misrepresentation, alleging that only three winning tickets were validly issued and so the jackpot should have been divided into thirds.

Chanquin's first amended cross-complaint alleges breach of contract, declaratory relief, breach of statutory duty and injunction, and conversion, premised on the same theories as Aguimatang's action. Chanquin additionally alleges violation of the statutory requirement that 50 percent of lottery revenues to be returned to the public in the form of prizes.

In May 1989, the State Lottery filed a motion for summary judgment or summary adjudication of issues as to both Aguimatang's second amended complaint and Chanquin's first amended cross-complaint.

In support of the summary judgment motion, the State Lottery submitted evidence of the following:

The State Lottery invited the public to participate in the California Lotto 6/49 Drawing for January 17, 1987 (Draw No. 14), with an expected "jackpot" of over $15 million. ▆▆ ▆▆ The general public was informed that the jackpot would be paid out on a "parimutuel" basis, i.e., divided among winning players who match all six numbers drawn.[6]

On January 17, 1987, a drawing was held, and the State Lottery announced the winning numbers. After the numbers were announced, the lottery auditors began calculating the prize pools for the different categories of prizes, based upon computer reports. Once all computer reports were completed, the State Lottery began final calculations and verifications of the amount of the prize pools for the different categories.

---

[6]Webster's Third New International Dictionary defines "parimutuel" as "a system of betting (as on a horse race) in which those who bet on the winner share the total stakes minus a small percent for the management . . . a machine for registering and indicating the number and nature of bets made (as on a horse race) in the pari-mutuel system of betting."

In opposing summary judgment, both Aguimatang and Chanquin disputed the State Lottery's factual assertion that "The general public was specifically informed that all payouts on Lotto 6/49 tickets were made on a pari-mutuel basis." This assertion was partially inaccurate, because small prizes are not paid on a pari-mutuel basis. Thus, it is apparent from the evidence cited by Chanquin that his dispute relates only to the immaterial fact that players who match "3 of 6" winning numbers do not share on a pari-mutuel basis but receive a set prize of $5. The "3 of 6" prize category is not at issue in this case.

The evidence before the trial court included the "play slip" on which players make their selections, and which both Aguimatang and Chanquin assert is part of their contract with the State Lottery. The play slip clearly stated that, other than the $5 prizes, "all other payouts are calculated by a parimutuel formula." While on the one hand asserting the play slip as part of his contract, Aguimatang nevertheless disputed the State Lottery's factual assertion of parimutuel prize division with the irrelevant statement, unsupported by any citation of evidence, that "The DEFENDANTS' advertising did not make it clear that parimutuel betting was involved."

The State Lottery contracts with GTECH Corporation to operate the on-line lottery system. All betting transactions originate at retailer terminals. The central computer receives, processes, and stores the transaction. After the central computer determines that the transaction has been properly stored, a response is sent to the terminal to print the ticket. Information printed on the ticket includes numbers played, issuing retailer, date purchased, drawing date, and a secure control number.

Records for all transactions are stored in the computer in a file called Transaction Master File (TMF). A Transaction Master File Information Retrieval Report (TMIR) is used to report on the transactions stored in the TMF. Information on the TMIR includes the date, time, and amount of the transaction, and whether the transaction is good or cancelled. Certain error conditions would show under the column title "ERR" on the TMIR.

The State Lottery maintains an Internal Control System (ICS) of total sales that is compared with the TMF's record of total sales.

When a drawing is held, the winning numbers are entered into the computer to check for winning transactions. The prize pool for each prize category is calculated based on the amount of sales.[7] Prizes are determined based on the number of winners found in each prize category. High tier prize winners are identified on a computer report entitled "FINDBIG." Information on FINDBIG includes identification of retailers.

Retailers are provided with an on-line retailer/operator manual that requires each retailer to complete a "weekly settlement" used for final accounting of transactions. A request for adjustment form is provided for those instances when a retailer is unable to cancel a transaction due to a failure of the on-line system. The request for adjustment must indicate the date, approximate time, and circumstances of the failure.

For the January 17, 1987 drawing, the computer records show five transactions[8] matching all six winning numbers. The FINDBIG report shows

---

[7]The available gross prize pool is approximately 50 percent of total sales for the drawing period immediately preceding the drawing at which the prize winners are determined. (Cal. State Lottery Rules & Regs. (6/49), rule 5(a).) The gross prize pool is broken down as follows: 40 percent is allocated to the prize category matching all six winning numbers; 21.35 percent is allocated to players who match "5 of 6 plus the bonus number;" 11 percent is allocated to the "5 of 6" prize category; 10 percent is allocated to the "4 of 6" prize category; and an estimated 17.65 percent is allocated to "3 of the 6" prize category. (*Ibid.*)

[8]The State Lottery used the word "wagers" instead of "transactions." The term "wager" was disputed by Aguimatang and Chanquin, who claim that "transactions" not "wagers" show on

one of those five transactions was cancelled before the drawing.[9] The other four transactions were shown on the computer as uncancelled, good transactions.

There was no indication of error in the computer system, dedicated lines, or retailer terminals. There was no discrepancy between computer reports generated by GTECH and by the State Lottery. The accounts receivable records balanced with ticket sales.

Of the four uncancelled transactions, the one for which no claim was made is serial number 7715988, which was a $1 sale made at the New Lun Wah Company in San Francisco on January 17, 1987, at 3:43 p.m. New Lun Wah Company's settlement envelope for that Drawing period reconciled with the computer report of total sales. All cancelled transactions for the drawing period were accounted for. New Lun Wah Company's settlement envelope also contained a retailer request for adjustment dated January 18, 1987, and signed by owner Paul Lee. Lee sought adjustment for a $5 sale that occurred on January 17, 1987, at approximately 1 p.m., due to printer fault and cutter fault. The settlement envelope contained a misprinted ticket and a cut-off "Reprint" ticket.

Based upon all its information, on January 20, 1987, the State Lottery announced there were four winners of the January 17, 1987, jackpot of $15.9 million.

Three persons—Aguimatang, Chanquin, and Jorgenson—presented valid winning tickets within the allowable claim period, and each received an annuitized prize of approximately $4 million, representing one-fourth of the prize pool.

No fourth ticket was presented for payment. Upon expiration of the 180-day period for claiming prizes, the State Lottery announced the reversion of the fourth share to the Education Fund.

In opposition to the State Lottery's showing on the motion for summary judgment, appellants showed that certain errors would not show on the State Lottery's computer. Thus, the computer would not show the issuance of a defective ticket or the failure to issue a ticket due to a retailer's printer

the lottery's computer because there can be no "wager" without evidence of a valid legible "ticket."

[9]Apparently, this was a transaction initiated by Aguimatang that was cancelled due to a defective ticket. A valid ticket was then issued. Thus, the computer showed two transactions —one valid and one void—at the California Club in San Diego, where Aguimatang bought his ticket. On January 18, 1987, a State Lottery security agent retrieved the cancelled ticket from that retailer.

jamming or running out of paper. The retailer is a critical component in the State Lottery's process of reconciliation and accuracy.

Appellants also filed extensive papers, discussed *post*, attempting to raise a triable issue as to whether a valid fourth ticket ever issued for the fourth winning transaction. The document on which Aguimatang placed primary emphasis was a copy of a January 18, 1987, request for adjustment submitted to the State Lottery by Paul Lee of the New Lun Wah Company, where the missing ticket was supposed to have issued. Aguimatang's copy of that form bore the handwritten notation "7715988" (the transaction number of the missing winning ticket) in the upper right hand corner. A copy of the form is found at appendix A, *post*.

Aguimatang also submitted a declaration from Paul Lee which we shall discuss later.

The trial court ultimately concluded the question whether a valid fourth ticket issued was immaterial, because the State Lottery's computer process, which was indisputably functioning properly, produced four winning wagers, and there is a presumption that if a wager is made and not cancelled, a valid ticket has been issued. The trial court rejected appellants' attempts to relitigate the legal issues decided against them at the demurrer stage regarding whether the State Lottery's procedures for division and reversion of prizes complied with the statutes. The trial court thus granted the motion for summary judgment as to the entire lawsuit.[10] Aguimatang and Chanquin appeal.

## DISCUSSION

### I. *Standard of Review*

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) ▮ The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. [Citation.] Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. [Citation.]

[10]The trial court treated the motion as to the negligent misrepresentation cause of action as a motion for judgment on the pleadings, which the court granted since there was no entitlement to the fourth share.

"......................

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial. [Citation.]" (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

■ The reviewing court is not bound by the trial court's reasoning in determining whether summary judgment was properly granted. (*Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219].)

II. *The State Lottery's Division and Reversion of Unclaimed Shares to Education Complies With the Statutes*

We first address the legal questions of statutory and rule interpretation as to the proper handling of prizes, assuming four winning wagers. We will then address the factual question whether a triable issue exists in this case as to the number of winning wagers.

Appellants renew in this court their challenge to the statutory authorization for the State Lottery's handling of the jackpot.[11]

A. *How a Prize Is Created*

■ Appellants contend the jackpot must be divided by the number of qualified claimants who present valid winning tickets, not by the number of

---

[11]We find no assistance in the cases cited by the parties. (*Horan* v. *State of California* (1990) 220 Cal.App.3d 1503 [270 Cal.Rptr. 194] [retailer who recovered stolen winning scratchoff ticket from employee was not entitled to prize because had not played ticket consistent with principles of fair chance]; *City of Gilroy* v. *State Bd. of Equalization* (1989) 212 Cal.App.3d 589 [260 Cal.Rptr. 723] [manufacturer's sale of printed tickets to lottery commission was not exempt from taxation as "lottery ticket sales" because printed tickets do not constitute lottery tickets until sold to the public for opportunity to win prize]; *McCabe* v. *Director of New Jersey Lottery Comm'* (1976) 143 N.J.Super. 443 [363 A.2d 387] [lottery statutes construed to preclude winner's assignment of annuitized prize]; *Karafa* v. *New Jersey State Lottery Com'n* (1974) 129 N.J. Super. 499 [324 A.2d 97] [lottery had no obligation to pay prize for lost ticket regardless whether claimant could otherwise prove wager; unlike other writings merely serving as evidence of underlying obligation, lottery ticket is itself the obligation and the debt].)

We deny Chanquin's request that we take judicial notice of the State Lottery's appellate brief in the *Horan* appeal.

We deny Chanquin's request for judicial notice of Ohio cases identified only by court docket number.

computer entries matching the winning numbers. Their contentions turn on their characterization of the $15.9 million jackpot as "the prize." We conclude appellants overlook the distinction between creating a prize and claiming a prize.

Appellants rely on former section 8880.32, subdivision (c), which at the time of Draw No. 14 provided: "No particular prize in any Lottery Game may be paid more than once, and in the event the Commission reaches a binding determination that more than one claimant is entitled to a particular prize, the sole remedy of the claimants is the award to each of them of an equal share in the prize and the Commission shall direct the Controller to disburse the award to the claimants in equal shares."[12] (Stats. 1986, ch. 848, § 2.)

Appellants' underlying premise is that the $15.9 million jackpot was a "particular prize." They apparently argue that "the sole remedy of the claimants is the award to them of an equal share in the [particular] prize," i.e., in the jackpot. However, as we shall explain, the jackpot is not a "particular prize." Rather, a "particular" prize is the share of the jackpot attributable to a winning wager.

"Prize" is not defined in the statutes. However, subject to limitations not material to this dispute, the State Lottery Commission has authority to promulgate rules and regulations "specify[ing] the number and value of prizes for winning tickets or shares in each Lottery Game" (§ 8880.29) and "specify[ing] the method for determining winners" (§ 8880.30).

The State Lottery's rules define "prize" as "amount paid for a winning number selection contained on an individual game board."[13] (Cal. State

---

[12] A 1989 amendment rewrote section 8880.32, subdivision (c), which now reads: "No particular prize in any Lottery Game shall be paid more than once." (Stats. 1989, ch. 917, § 5.)

Chanquin cites a letter from the State Lottery's legislative liaison to the Senate Governmental Organization Committee explaining the reason for the amendment of section 8880.32, subdivision (c), was because disputes between two or more holders of a single ticket should be decided by the courts.

However, even assuming for the sake of argument the letter constitutes properly cognizable legislative history, the letter merely supports the conclusion, evident from the statutory language itself, that former section 8880.32, subdivision (c), referred to the inapposite situation of disputes between competing claimants under a single ticket.

[13] The "game board" referred to in the prize definition is not a ticket. The game board is any one of five number grids on a "play slip" on which a player marks selection(s). (Cal. State Lottery Rules & Regs. (6/49), rule 2(e).) A "play slip" is "a card used in marking a player's selections(s)," which will then be recorded on a ticket. (Rule 2(d).) A play slip is not evidence of ticket purchase or of numbers selected. (Rule 3(c).) " 'Ticket' means a California Lotto 6/49

Lottery Rules & Regs. (6/49), rule 2(1).[14]) Rule 2(c) defines "selection" as "a set of six (6) unique numbers chosen by a player from a set of integers, one (1) through forty-nine (49) inclusive, which set appears on a ticket as a single set of numbers to be played by a player in a game."

To make a selection, "a player must select one or more sets of six (6) different numbers . . . for input into a retailer terminal. . . . The retailer will then issue a ticket, via the terminal, containing the selected set or sets of numbers, each set of which constitutes a selection. A ticket can contain up to five (5) selections, labelled A through E." (Rule 3(b).)

"Each selection made during the Drawing period shall be placed into a California Lotto 6/49 pool, which shall be eligible for the Drawing of the winning numbers at the conclusion of the period." (Rule 3(c).)

A ticket is the only proof of selection and the only valid receipt for claiming a prize. (Rule 3(c).)

In the event that more than one player is successful in matching all six winning numbers, all players with such winning selections shall divide equally the respective prize pool amount for that prize category. (Rules 4(c), 5(c)(2).)

In the event there is no valid winning ticket for the "6 of 6," "5 of 6 plus bonus number," "5 of 6," or "4 of 6" prize categories in any given Drawing, all monies allocated for those prize categories shall be carried forward or rolled over to the following week. (Rule 5(c)(4).)

From the foregoing rules, it is apparent that a "prize" is the entitlement due on an individual wager, with the amount determined by total sales. Thus, in this case, the $15.9 million jackpot was the "prize pool" for the six-of-six "prize category." Where four players win that prize category, there will be four prizes, each amounting to one-fourth of the prize pool.

This delineation of prizes is within the State Lottery's statutory authority to specify the number and value of prizes and the method for determining winners. (§§ 8880.29, 8880.30.) It does not conflict with former section

---

ticket produced by a CSL terminal and containing a record of the selection(s) made by a player and the amount paid for such selection(s)." (Rule 2(b).)

[14]Undesignated rule references are to the California State Lottery California Lotto (6/49) Rules and Regulations that were in effect for the January 17, 1987, Drawing, a copy of which was submitted to the trial court in connection with a prior demurrer and incorporated by reference in the motion for summary judgment We note the record also contains a subsequent version of the rules with amendments made after Draw No. 14.

The lottery rules and regulations are exempt from the Administrative Procedure Act (§ 8880.26), and so do not appear in the California Code of Regulations.

8880.32, subdivision (c), which on its face addressed the situation of competing claims for the same prize—e.g., where two persons made a claim on the same wager.

We therefore conclude that, assuming four winning wagers, the fourth share was a separate prize and a "particular prize" within the meaning of former section 8880.32, subdivision (c). The $15.9 million jackpot was not a "particular prize." Consequently, former section 8880.32, subdivision (c) did not require division of the jackpot among claimants presenting winning tickets.

### B. *Reversion to Education Was Proper*

██ Appellants contend reversion of the prize money to education under former section 8880.32, subdivision (e) was improper.

Section 8880.32, subdivision (e), at the time of Draw No. 14, provided as follows: "Players shall have the right to claim prize money for 180 days after the drawing or the end of the Lottery Game or play in which the prize was won. The Commission may define shorter time periods for eligibility for participation in, and entry into, drawings involving entries or finalists. *If a valid claim is not made for a prize directly payable by the Lottery Commission within the period applicable for that prize, the unclaimed prize money shall revert to the benefit of the public purpose described in this chapter* [i.e., public education]." (Stats. 1986, ch. 848, § 2, italics added.)

Appellants first note the statute allows reversion only "*If a valid claim is not made for a prize*" (italics in original), and argue they made claims for the fourth prize, hence the statute is inapplicable. We have already concluded that a prize is an entitlement under an individual winning wager. Therefore, assuming four winning wagers, appellants had no valid claim for the fourth prize.

Aguimatang then contends reversion to education applies only to prizes "directly payable *by the Lottery Commission*" (italics in original), and jackpot prizes are annuitized payments on annuity investments made by the State Treasurer, not the State Lottery.

The question, then, is what is a prize "directly payable *by the Lottery Commission*"?

Technically, no prizes are directly payable by the Lottery Commission. They are paid by the Controller or by a retailer. Thus, the Lottery Fund is a special fund within the State Treasury. (§ 8880.61.) "Money may be drawn

from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." (Cal. Const., art. XVI, § 7.) Section 8880.62 provides in part: "Funds shall be disbursed from the State Lottery Fund by the State Controller for [] the payment of prizes to the holders of valid lottery tickets or shares . . . ." The State Controller's answers to interrogatories say that "all prizes which are not paid to the public through lottery retailers are paid by state defendant and cross-defendant Controller on behalf of state defendant and cross-defendant Lottery Commission."

The State Lottery may authorize the retailer to validate claims and pay prizes. Thus section 8880.32, subdivision (a), provides (and provided at the time in question): "For convenience of the public, Lottery Game Retailers may be authorized by the Commission to pay winners of up to six hundred dollars ($600) after performing validation procedures on their premises appropriate to the Lottery Game involved." The State Lottery has exercised this authority in the Lotto game by authorizing retailers to pay Lotto prizes up to $99. (Rule 7(b).) Chanquin thinks the Lottery itself can directly pay prizes under section 8880.32, subdivision (d), which provides: "The Commission may specify that winners of less than twenty-five dollars ($25) claim the prizes from either the same Lottery Game Retailer from whom it was purchased or from the Lottery itself." By its terms, however, this subdivision speaks only of taking claims, not of paying claims. Its evident purpose is to allow the State Lottery to require small prize winners to go through the retailer. The State Lottery has chosen to require $5 Lotto prize winners to claim their prize from the retailer (unless the winner resides out of state). (Rule 7(b).)

Since prizes are paid by the Controller or by the retailer, technically no prizes are "directly payable by the Lottery Commission."

We will not adopt a technical interpretation of section 8880.32, subdivision (e), because it would lead to the absurd result that no unclaimed prize money would revert to education. ■ " '[W]here the language of a statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted.' " (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157], quoting *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].)

Moreover, in this instance, we will give deference to the interpretation of an administrative agency (the State Lottery) charged with administration of the statute. (See *Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d

1, 8 [192 Cal.Rptr. 134, 663 P.2d 904].) ▆▆ Hence, we will interpret "directly payable by the Lottery Commission" to mean "paid upon the authority of the Lottery Commission" and not by a retailer.

A 1989 amendment changed the last sentence of subdivision (e) of section 8880.32 to read: "If a valid claim is not made for a prize directly payable by the Lottery Commission *or for any Lotto prize* within the period applicable for that prize, the unclaimed prize money shall revert [to education]." (Stats. 1989, ch. 917, § 5, italics added.)

Chanquin contends that the 1989 amendment prospectively affects only retailer-payable Lotto prizes, and that the new language means that the reverter provision had no prior application to Lotto at all but applied only to other Lottery Games such as the "scratcher" game. The 1989 amendment, though not in place at the time of Draw No. 14 may shed light on the meaning of the statute in place at the time of Draw No. 14. ▆▆ Although subsequent legislation cannot change the meaning of an earlier enactment, it does supply an indication of legislative intent which may be considered with other factors in arriving at the true intent existing when the legislation was enacted. (*Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 852 [244 Cal.Rptr. 682, 750 P.2d 324].)

Chanquin filed in this court a motion for judicial notice of numerous legislative materials relating to the 1989 amendment. Some of the materials do not constitute appropriate legislative history. However, an Assembly Governmental Organization Committee statement, constituting cognizable legislative history (*Hutnick* v. *United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326]) states in part: "[T]he State Controller stated that $5.9 million in unclaimed Lotto prizes were illegally being held by the Lottery Commission which should have gone exclusively to education. [] [¶] The State Lottery Commission counters that the law only requires reversion to education of 'unclaimed prize money *directly* payable by the Lottery Commission' [] and that the Lotto prize money at issue is directly payable be [*sic*] retailers not the Lottery Commission since retailers pay the small [up to $10] Lotto prize winnings. [¶] This bill would resolve the debate in favor of the Controller's position by declaring that unclaimed Lotto prizes shall be reverted to education the same as all other unclaimed prizes payable by the Commission."

▆▆ Chanquin also cites a legislative analyst's report, which is also cognizable legislative history. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 300 [250 Cal.Rptr. 116, 758 P.2d 58].) The report states in part: "The provisions of this bill providing unclaimed Lotto prize money to revert to the benefit of public education is assumed will

result in some additional funds for public education. The Commission indicates that $9 million went unclaimed in 1987-88 from *retailer-payable* Lotto prizes." (Italics added.)[15]

■ It therefore appears that the purpose of the 1989 amendment was to insure that unclaimed prizes payable directly by retailers would revert to education, in the same manner as other unclaimed prizes paid upon the authority of the commission.

We also note the effect of the 1989 amendment was to resolve an ambiguity in the disposition of low level Lotto prizes, created by the State Lottery's rule making payment of $5 prizes dependent on the state of residence of the winner. Thus, under rule 7(b)(1), "a [Lotto] prize of $5.00 or less must be claimed *only* from an authorized CSL retailer, unless the claimant resides outside California."[16] Since, when a prize is unclaimed, it cannot be known whether the winner is a California resident, there would have been no way to determine whether unclaimed $5 Lotto prizes should revert to education under former section 8880.32, subdivision (e). The statutory amendment resolved that question.

We conclude that, assuming four winning wagers, reversion of the unclaimed fourth prize to education was proper under former section 8880.32, subdivision (e).[17]

 C. *Reversion Does Not Violate the Requirement That 50 Percent of Revenues Be Returned to the Public*

■ Chanquin contends, as alleged in his cross-complaint, that reversion of the fourth prize to the Education Fund is precluded by the statutory requirement that "50% of the total annual revenues shall be returned to the public in the form of prizes . . . ." (§ 8880.4.) This requirement is found in section 8880.4, which provides in pertinent part: "Not less than 84% of the total annual revenues from the sale of state lottery tickets or shares shall be returned to the public in the form of prizes and net revenues to benefit public education. 50% of the total annual revenues shall be returned to the public in the form of prizes as described in this Chapter and at least 34% shall be allocated to the benefit of public education as specified in § 8880.5. In

---

[15]Chanquin's request for judicial notice is therefore granted as to the materials discussed in the text and is denied with respect to the remainder.

[16]Compare the rules for the "Instant Game" with scratch-off tickets; low-level prizes are validated and paid by the retailer, apparently without regard to the residence of the winner. (Cal. State Lottery Rules & Regs. for Instant Game, rules 2.10, 13.1(g), 13.2(g).)

[17]We reach this conclusion without reliance on the opinions expressed in the State Lottery's declarations, and so need not address appellants' evidentiary objections to those declarations.

addition, all unclaimed prize money shall revert to the benefit of public education as provided for in § 8880.32(e)."

The State Lottery's evidence on the motion for summary judgment merely showed that 50 percent of Lotto revenues on a weekly basis are *allocated* for prizes (40 percent for the jackpot and 10 percent split among the lower prize categories), with rollover from the previous drawing added to the prize pool after the 50 percent calculation is made. Thus, it is apparent that reversion to education of any prize would result in less than 50 percent return to the public.

Although the statutory language of the second sentence of section 8880.4, read in isolation, is unambiguous in requiring a "return" of money to the public, there is a latent ambiguity that becomes apparent with the next sentence of section 8880.4. Thus, while the statute first directs that 50 percent of revenues be returned to the public and a minimum of 34 percent be allocated to education, section 8880.4 goes on: "*In addition*, all unclaimed prize money shall revert to the benefit of public education . . . ." (Italics added.)

Since the Lottery Act also directs that 50 percent of revenues be "apportioned" to prizes (§ 8880.63[18]), to interpret literally the "return to public" language would preclude any unclaimed prize money from ever reverting to education, in direct contradiction to the further mandate of section 8880.4 and section 8880.32, subdivision (e).

■ "The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] [] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]. . . ." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

■ In seeking to ascertain the intent of the voters in approving a ballot measure, we may consider the official statements submitted to the voters. (*City of Gilroy* v. *State Bd. of Equalization, supra,* 212 Cal.App.3d 589, 599.) Here, the November 1984 ballot materials on Proposition 37 stated in part: "The measure would require that 50 percent of the proceeds from lottery

---

[18]Section 8880.63 provides: "As nearly as practical, 50% of the total projected revenue, computed on a year-round basis for each lottery game, accruing from the sales of all lottery tickets or shares from that lottery game shall be apportioned for payment of prizes."

ticket sales be paid out as lottery *prizes*, and that no more than 16 percent be used for *administrative costs* . . . . The remainder of the proceeds from ticket sales—at least 34 percent of the total—would be placed into a new special fund from which moneys would be appropriated for the benefit of *public education.* Any unclaimed lottery prizes and unused funds available for administrative costs would also be placed into this fund." (Ballot Pamp., analysis of Prop. 37 by the Legis. Analyst as presented to the Voters, Gen. Elec. (Nov. 6, 1984), italics in original.)

 The first and last sentences of this argument may be reconciled if we construe this language to mean that a prize is "paid out" when it is paid to the Education Fund.

Moreover, the Lottery Act, as approved by the voters, states: "The People of the State of California declare that the purpose of this Act is support for preservation of the rights, liberties and welfare of the people by providing additional monies to benefit education without the imposition of additional or increased taxes. []" (§ 8880.1.)

In light of this purpose, it thus seems the more reasonable construction of section 8880.4 is that the 50 percent of revenues must be *allocated* to prizes.

We recognize that the Attorney General reached a contrary conclusion in connection with a short-lived opinion under former section 8880.32, subdivision (e), that unredeemed "3 of 6" Lotto prizes of California residents were not required to be transferred to education because they were paid by the retailer, hence not directly payable by the Lottery Commission.[19] (72 Ops.Cal.Atty.Gen. 200 (1989).) The Attorney General reasoned in part that reversion would upset the 50 percent "return to public" requirement.

 However, Attorney General opinions are not binding on this court. (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].) The rule that such opinions are persuasive authority stems from a presumption that the Legislature is aware of the Attorney General's construction and would take corrective measures if that construction misstates the legislative intent. (*Ibid.*) In this case, the Attorney General's opinion was published in October 1989—one month after the Governor signed into law the amendment to section 8880.32,

---

[19]The Attorney General opinion specified it addressed only unredeemed prizes of California residents, (72 Ops.Cal.Atty.Gen. 200, 202, fn. 5 (1989)), because the rules require California residents to claim their $5 prize only from the retailer but allow out-of-state residents to claim $5 prizes from the Lottery Commission. We question the value of the Attorney General opinion because, as we have noted, it cannot be determined whether "unredeemed" tickets were purchased by California residents.

subdivision (e), authorizing reversion of any unclaimed Lotto prize to education. (Stats. 1989, ch. 917, § 5.) The Attorney General opinion specified it applied only until the January 1, 1990, effective date of the statutory amendment. It thus appears the Legislature, by authorizing reversion of any unclaimed Lotto prizes, implicitly disagreed with the Attorney General that rollover of unclaimed "3 of 5" prizes is compelled by the requirement that 50 percent of revenues be returned to the public.

We therefore construe section 8880.4 as requiring that 50 percent of revenues be *allocated* to prizes. Unclaimed prizes falling within this 50 percent allocation revert to the Education Fund.

Having resolved the legal questions regarding disposition of the fourth share of the jackpot, we turn now to the questions of the sufficiency of the State Lottery's showing on summary judgment and whether appellants raised a triable issue of material fact.

III. *The State Lottery's Initial Showing Was Sufficient to Make Out a Prima Facie Entitlement to Summary Judgment*

■■■ Appellants contend the State Lottery failed to establish entitlement to summary judgment because it failed to prove that the fourth winning transaction was a completed wager for which a valid ticket issued.

The State Lottery takes the position that it may rely on its computer information regardless whether a valid fourth ticket ever issued, and that responsibility for nonproduction of tickets is not assumed by the state but is left with those whose fault, neglect, or inadvertence caused the loss.[20]

While we agree with appellants that issuance of a valid ticket is material to the determination of winners, we find the State Lottery's initial showing sufficient.[21]

---

[20]The State Lottery refers to rule 3(e), which states in part: "It shall be the sole responsibility of the player to verify the accuracy of the player's selection(s) and other data printed on the ticket. The making of a selection is done at the player's risk through the on-line retailer who is acting on behalf of the player in entering the selection. The CSL shall not be responsible for tickets printed in error, and its liability to the player in such case shall be limited to the voiding (cancellation) of the erroneous ticket . . . ."

[21]Because we conclude the State Lottery had to show issuance of a valid ticket, we do not address appellants' speculation as to the statutory authority for the trial court's "presumption" that the fourth ticket issued.

### A. A Prize Is Created Only if a Valid Ticket Issues, Constituting a Winning Wager.

The State Lottery concedes the existence of an implied contract with appellants. We are aware of authority holding that, in the absence of a winning ticket, no enforceable contractual right exists against the stakeholder in pari-mutuel betting. (*Valois* v. *Gulfstream Park Racing Ass'n* (Fla.Dist.Ct.App. 1982) 412 So.2d 959; *Seder* v. *Arlington Park Race Track Corp.* (1985) 134 Ill.App.3d 512 [481 N.E.2d 9]; *Bourgeois* v. *Fairground Corp.* (La.Ct.App. 1985) 480 So.2d 408; *Hochberg* v. *New York City Off-Track Bet. Corp.* (1973) 74 Misc.2d 471 [343 N.Y.S.2d 651]; *Holberg* v. *Westchester Racing Ass'n* (1945) 184 Misc. 581 [53 N.Y.S.2d 490].) We need not determine that issue here, because appellants' assertion of rights is based on their possession of winning tickets. Under these circumstances, the State Lottery properly concedes the existence of a contractual relationship with appellants.

The State Lottery's rules are part of its contract with appellants, as stated in the rules (rule 8), on the play slip, and on the ticket.[22]

As we have noted, the rules define "prize" as "amount paid for a winning number selection . . . ." (Rule 2(l).) Rule 2(c) defines "selection" as "a set of six (6) unique numbers chosen by a player from a set of integers, one (1) through forty-nine (49) inclusive, *which set appears on a ticket* as a single set of numbers to be played by a player in a game." (Italics added.) Since a prize requires a winning number selection, and since a selection appears on a ticket, a ticket is necessary to create a prize. This conclusion is reinforced by rule 3(b) which states in part: "The retailer will then issue a ticket, via the terminal, containing the selected set or sets of numbers, *each set of which constitutes a selection*." (Italics added.) Once again, since a selection is necessary for a prize, and since the selection appears on a ticket, issuance of a ticket is necessary to create a prize.

Additionally, rule 3(c) provides that a ticket is the only proof of selection and the only valid receipt for claiming a prize.

Finally, issuance of a valid ticket to create a prize is consistent with the State Lottery's advertisement of the Lotto game as based on a "parimutuel"

---

[22]Rule 8 says: "In purchasing a ticket, the customer agrees to comply with, and abide by, California law, and all rules and regulations and final decisions of the CSL, and all procedures and instructions established by the CSL or Director for the conduct of the game." The play slip says: "Lotto 6/49 is governed by state law and the rules and regulations of the California State Lottery." The ticket says: "Determination of winners is subject to California Lottery Commission Rules and Regulations."

basis. A pari-mutuel system is one in which those who bet on the winner share the total stakes minus a small percent for the management. (See fn. 6, *ante*.) It would be wholly unreasonable and unfair for the public to think that shares of the jackpot (prizes) would be created even though no valid wager was ever made because no valid ticket ever issued.

For all these reasons, a "prize," subject to reversion to the Education Fund, is created only when a valid winning ticket issues. If no valid ticket issues and there is consequently no wager or bet, no "prize" is created.

### B. *The State Lottery Made a Prima Facie Showing That It Was Entitled to Summary Judgment.*

This leaves the question whether there is a triable issue of fact with respect to whether the fourth missing ticket issued. We shall examine first the showing made by the State Lottery to see whether it made out a prima facie entitlement to summary judgment. (See Code Civ. Proc., § 437c, subd. (b).)

As we have described, the State Lottery submitted evidence of how its procedures work, that the computer process was functioning properly at the time in question, that no errors were indicated, that the computer information reconciled with accounts receivable records, and that New Lun Wah Company's settlement envelope reconciled with the State Lottery's information, with no indication that that fourth winning transaction was a void transaction.

The State Lottery's evidence sufficiently showed that four valid winning tickets issued, resulting in the creation of four prizes, based not only on its computer records but also on reconciliation of those records with the retailer's information.

We disagree with appellants' contention that the only way the State Lottery could show issuance of the fourth ticket was by showing the ticket itself because the State Lottery's own rules say the "ticket is the only proof." (Rule 3(c).[23]) Since the State Lottery never has physical possession of a ticket until a player presents a ticket to claim a prize or a retailer returns a cancelled ticket, the rule can only be reasonably construed to mean that the ticket is the only proof for purposes of *claiming* a prize.[24] The rule does not

---

[23]Rule 3 is entitled "Method of Play." Rule 3(c) states in part: "A California Lotto 6/49 *ticket* shall be the only proof of selection or play and the only valid receipt for claiming a prize or prizes."

[24]We note, however, that after Draw No. 14, section 8880.32, subdivision (b) was amended and now provides in part: "The Lottery may pay a prize of less than one million dollars

require the State Lottery to produce a ticket in order to show that the ticket issued.

Citing *People* v. *Rath Packing Co.* (1974) 44 Cal.App.3d 56 [118 Cal.Rptr. 438], Chanquin contends the State Lottery had the burden to show that there was no possibility of error in its procedures. *Rath* was an action brought by the People to enjoin a meat processor from selling allegedly short-weight bacon packages. The trial court granted the People's motion for summary judgment based on the inspector's affidavit that on a number of occasions he weighed Rath bacon packages which contained less than their stated weights. (*Id.* at p. 62.) The appellate court noted this affidavit, if uncontroverted, would entitle the People to judgment. (*Id.* at p. 62.) However, the opposition's declarations contained facts from which the inference could be drawn that the inspector erred—that the inspector never weighed the actual net contents but took gross weight and subtracted an estimated wrapper weight, that the inspector's estimated wrapper weight was of a wet rather than dry wrapper, which could result in a lesser calculated net weight, and that some of the package codes reported by the inspector were not Rath products. (*Id.* at pp. 61, 64.) The presumption that official duty has been regularly performed (Evid. Code, § 664) did not alter the substantive showing required for summary judgment; as the Court of Appeal stated, "[the People] must demonstrate that there is no possible way in which Rath can claim error in the weighing procedures used by [the inspector]." (*Rath, supra,* at p. 65.) Summary judgment was reversed because the meat processor demonstrated a possibility of error. (*Ibid.*)

We do not read *Rath* as requiring the State Lottery in its *initial* showing to demonstrate the absence of any possibility of error. As *Rath* noted, the People's initial showing of short-weighted inspections was sufficient, if uncontroverted. (44 Cal.App.3d at p. 62.) It only became insufficient when controverted by the party opposing summary judgment. Once the opposing party demonstrated the possibility of error in weighing procedures, the People would have to demonstrate no possibility of error in weighing procedures in order to overcome the opposition.

Here, the State Lottery's initial showing was sufficient.

C. *Appellants' Evidentiary Objections to the State Lottery's Showing Are Not Meritorious.*

Appellants make numerous contentions that the State Lottery's evidence was for the most part inadmissible.

($1,000,000) even though the actual winning ticket is not received by the Lottery if the Lottery validates the claim for the prize based upon substantial proof." (Stats. 1988, ch. 1065, § 1.)

In response to appellants' extensive objections below, the trial court stated: "Evidence objections of plaintiff and cross-complainant are overruled as to facts material to the issues of the case. They were not considered as to immaterial facts."

 Appellants fail on appeal to articulate evidentiary objections in the form required by California Rules of Court, rule 15(a), which provides in part: "The statement of any matter in the record shall be supported by appropriate reference to the record." Appellants mainly refer us to the trial briefs and apparently expect this court to ferret through 1,400 pages of summary judgment papers in order to locate the challenged evidence.

In *Biljac Associates* v. *First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1422 [267 Cal.Rptr. 819], the appellate court declined to review evidentiary objections insofar as they were not properly briefed on appeal. The court noted the rule that "an appellant must fully present all arguments in briefs rather than incorporate them by reference from papers filed below." (*Id.* at p. 1422.)

Here, where the record contains 1,400 pages of papers supporting and opposing the motion, it was particularly important for appellants properly to brief the issues on appeal, with appropriate citation to the location of the challenged evidence in the record.

We will therefore consider appellants' evidentiary arguments only insofar as they have been properly briefed.[25]

 Aguimatang's brief argues that supposedly "all" of the State Lottery's declarations were defective because they included the phrase "to the best of my knowledge," which is assertedly insufficient as failing to show personal knowledge. (*Witchell* v. *De Korne* (1986) 179 Cal.App.3d 965 [225 Cal.Rptr. 176]; *Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705 [136 Cal.Rptr. 871].)

However, Aguimatang cites only one declaration with the claimed defect (and our review of the declarations filed with the moving papers disclose no others.) Thus, Carol Clark declared she was custodian of records for the State Lottery and that certain records attached as exhibits to the declaration of Alfred Dial (former lottery auditor) are photocopies of original records kept in the regular course of business. The declaration is made to the best of

---

[25]We will also disregard the contention that not all originals were produced at the hearing in the trial court, as required pursuant to appellants' demand, because appellants do not specify which documents were not produced.

her knowledge and belief.[26] However, these documents are primarily forms and worksheets prepared by Dial in calculating the prize amounts based on the number of winners for Draw No. 14. Dial's declaration is made on personal knowledge. Therefore, any error in admitting the Clark declaration was harmless and does not justify reversal. (Evid. Code, § 353, subd. (b).)

We note Dial's declaration includes a computer printout of the number of winners. Chanquin objects generally to all declarations of State Lottery employees on the ground that they refer to computer records (attached to each declaration) that are inadmissible hearsay.

Computer printouts are admissible and are presumed to be an accurate representation of the data in the computer. (Evid. Code, § 1500.5.[27]) If offered for the truth, however, they must qualify under some hearsay exception, such as business records under Evidence Code sections 1271.[28] (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 4.3, pp. 236-237.) A trial court has wide discretion in determining whether sufficient evidence is adduced to qualify evidence as a business record. (*People* v. *Lugashi* (1988) 205 Cal.App.3d 632, 640 [252 Cal.Rptr. 434] [a "qualified witness" for purpose of admitting computer records need not be computer expert but need only generally understand system's operation and possess sufficient skill to properly use system and explain resulting data].)

Chanquin contends the computer printouts do not qualify as business records of the State Lottery, because they are records not of the State Lottery but of GTECH, the private firm under contract to provide and operate the lottery's on-line system. This overlooks the fact that GTECH itself provided

[26]The same declaration by Clark accompanies all declarations by other State Lottery persons, which were resubmitted with the reply papers.

[27]Evidence Code section 1500.5 makes computer recorded information "admissible to prove the existence and content of the computer information or computer program" and provides that "Printed representations of computer information and computer programs will be presumed to be accurate representations of the computer information or computer programs that they purport to represent. This presumption, however, will be a presumption affecting the burden of producing evidence only. If any party to a judicial proceeding introduces evidence that such a printed representation is inaccurate or unreliable, the party introducing it into evidence will have the burden of proving, by a preponderance of evidence, that the printed representation is the best available evidence of the existence and content of the computer information or computer programs that it purports to represent."

[28]Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

a foundation for admission of the documents as its own business records through a declaration from GTECH director Leonard Paster.

Chanquin further complains that the computer records were not shown to qualify as business records, because they were not made at or near the time of the event. (Evid. Code, § 1271, subd. (b).) This apparently refers to the TMIR printout (showing time and dollar amount of transactions for the Jan. 17, 1987, drawing), which was dated October 1988. TMIRs are printed out only on an as needed basis because it would be too cumbersome to store hard copies of each transaction recorded for each draw. However, the information contained on the computer's magnetic tapes, from which the TMIR is printed, is recorded daily as it is generated.

Chanquin cites no authority holding that the retrieval, rather than the entry, of computer data must be made at or near the time of the event. Thus, although to qualify as a business record the "writing" must be made at or near the time of the event, "writing" is not limited to the commonly understood forms of writing but is defined very broadly to include all "means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof." (Evid. Code, § 250.) Here, the "writing" is the magnetic tape. The data entries on the magnetic tapes are made contemporaneously with the Lotto transactions, hence qualify as business records. The computer printout does not violate the best evidence rule, because a computer printout is considered an "original." (Evid. Code, § 255.)

We conclude appellants fail to show the trial court abused its discretion in admitting the computer records.

■ Chanquin then objects to one of Paster's declarations which states that various computer printouts were printed in accordance with correct procedures for getting hard copies from magnetic tapes and that the printouts contained pertinent and conforming information. We disagree with the apparent argument that the statement is a mere opinion. As director of GTECH, Paster was qualified to provide the foundational basis for the business records.

Aguimatang objects to Paster's declaration on the ground that Paster did not state he compared copies to originals, as required by *Dugar* v. *Happy Tiger Records, Inc.* (1974) 41 Cal.App.3d 811, 818 [116 Cal.Rptr. 412]. That case is distinguishable. *Dugar* held that where affidavits referred to "attached" documents that were not in fact attached, an attempt by the party's attorney to add the documents as an exhibit via his own declaration was

insufficient, since the attorney did not attest he had personally examined the documents and determined they were the same. (*Id.* at pp. 814-815.) Here, the documents were attached to the declaration, so there was no need for comparison to assure that a later submission of exhibits matched those referred to in the declaration. There was no problem under *Dugar.*

██ Chanquin next objects to the declaration of the State Lottery's security director Lew Ritter, because his references to the computer printouts attached to his declaration state they "appear" to be correct. Chanquin says this is mere opinion and illustrates that CSL has no original data of its own to verify the validity of transactions. Ritter's declaration is not mere opinion, however, because as to each printout he goes on to state (1) his security division conducted a review of all pertinent GTECH reports for Draw No. 14 and found them to be consistent; (2) as claimants came forward to claim prizes, their claim/ticket information matched the computer information; and (3) Ritter personally supervised the review and found each printout to be correct. Thus, Ritter states facts within personal knowledge, not opinion.

We need not address Chanquin's evidentiary objections to the declarations of the State Lottery's public affairs officer and accounting officer, because their declarations are not material to our decision.

We conclude appellants' evidentiary objections are either waived or meritless, and the State Lottery's moving papers established prima facie entitlement to summary judgment.

*IV. Appellants' Opposition to the Motion Raised No Triable Issue of Fact; However, Appellants Should Have Been Granted a Continuance to Pursue Discovery*

██ We next examine the opposition to determine whether appellants raised any triable issue of material fact.

In addition to his motion to strike evidence, Aguimatang filed an opposition. Aguimatang's response to the State Lottery's separate statement of undisputed facts disputes almost all of the facts asserted by the State Lottery and adds an "additional statement of undisputed facts" containing 80 new factual assertions. Chanquin's opposition raised similar issues.

Whether appellants showed a triable issue of fact is determined under subdivision (c) of Code of Civil Procedure section 437c. That statute provides that, in determining summary judgment, the court considers the evidence, and "all inferences reasonably deducible from the evidence, except

summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).)

As we shall discuss, appellants ask us to draw inferences from evidence they adduced at the hearing. In deciding whether an inference may be drawn, we have in mind that, "An inference is a deduction of fact that may *logically and reasonably* be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b), italics added.) ▮▮▮ An inference is more than a surmise or a conjecture. (*People v. Mayo* (1961) 194 Cal.App.2d 527, 535 [15 Cal.Rptr. 366]; *Estate of Braycovich* (1957) 153 Cal.App.2d 505, 512 [314 P.2d 767].) An inference cannot be based on mere possibilities; it must be based on probabilities. (*People v. Mayo, supra,* 194 Cal.App.2d at p. 536; *People v. Berti* (1960) 178 Cal.App.2d 872 [3 Cal.Rptr. 514]; *Sanders v. MacFarlane's Candies* (1953) 119 Cal.App.2d 497, 500 [259 P.2d 1010].)

With these rules in mind, we turn to the evidence appellants submitted in opposition to the motion.

As to the State Lottery's numerous factual assertions regarding the number of transactions recorded by the computer and the absence of any indication of computer error, Aguimatang responded repeatedly as follows: "DISPUTED: 'Transactions' not 'wagers' show on computer. Defendants offer no evidence that a TICKET was issued for transaction no. 7715988." As evidence of a dispute, Aguimatang cited testimony from three depositions as follows:

First, Gordon Jones (apparently a State Lottery employee) testified it could happen that the central computer registers a wager but no ticket issues from the terminal because the printer jams or the terminal runs out of paper. Such occurrences are very rare. The person in that situation would not receive a prize.

Second, State Lottery security agent William Brewer testified that, though he is comfortable that a ticket was issued, no one can be 100 percent certain that a ticket issued.

Third, Louis Mucci, Chief Gaming Systems and Planning Manager for the State Lottery, stated he had no opinion on whether a ticket was issued at the retailer terminal, and that the retailer is a critical component in the process of reconciliation and accuracy.

None of this testimony refutes the State Lottery's evidence or controverts the reasonable inference that the fourth ticket issued. A showing that a glitch may occur is insufficient to contradict the inference raised by the State Lottery's evidence that no glitch occurred on that day, with that retailer, for that transaction. The cited testimony failed to show a *probability* of malfunction necessary to the creation of an inference. (E.g., *People* v. *Mayo, supra,* 194 Cal.App.2d at p. 536.)

As to the State Lottery's assertions that computer reports were in balance and showed that recorded transactions reconciled with ticket sales, Aguimatang submitted a declaration from Paul Lee, owner of the New Lun Wah Company, the retailer involved in the missing winning ticket.[29] Although Lee recounted a general problem with the terminal and his own failure to follow State Lottery procedures regarding cancellation, his only statement regarding the critical date of January 17, 1987, was that he recalled the incident of the $5 adjustment because it occurred on the day of the drawing. However, Lee deleted the typewritten portion of the declaration to the effect there were other mishaps that day and handwrote: ". . . I don't recall if there were more."

Contrary to appellants' contentions, Lee's declaration does not suggest the $5 adjustment was necessitated by the computer's failure to acknowledge a

---

[29]Lee made and initialled handwritten changes to the typewritten declaration, which states in part (with handwritten additions underlined):

"[O]n more than one occasion from the time I started to sell Lotto 6/49 tickets, up to and including January 17, 1987, my cash drawer where we place money from Lotto 6/49 sales has been different from what the terminal indicated had been sold on a particular day. Sales are made by me and my employee MEI HUA CHU who is assigned that duty regularly.

"The cash drawer occasionally contained more and occasionally less money than our terminal indicated should have been in the drawer based upon sales of tickets for each day, *because of sometimes maybe wrong change on merchandise purchases.*"

Lee then recounts his own failure to follow State Lottery procedures in that he sometimes reported "cancellation" late or not at all. "On occasion we were unable to complete the 'cancellation' process through the terminal." On other occasions, Lee paid claims even though the customer had no ticket and gave a refund for an unreadable ticket the day after the sale, then reported the cancellation to the State Lottery the following day. There were instances in which Lee never reported misprinted tickets but refunded the player's money and paid for the ticket out of Lee's own pocket in order to keep his report to the Lottery correct.

As to the critical date of January 17, 1987, Lee declared: "I recall the $5.00 refund/ adjustment I requested of the CSL for the day of the Saturday, January 17, 1987 drawing. I remember specifically because the ERRORS committed by the TERMINAL occurred on the DAY OF THE DRAW. Although I requested an adjustment of only $5.00. I know that the number of Tickets which were actually Entered into the terminal but which were Not Sold (and thrown away) totalled more than Five. *I have struck out the above because I don't recall if there were more.*

"The day of January 17, 1987 draw was a very busy day of sales of Lotto 6/49 tickets. [] MEI had a lot of problems with the TERMINAL *on many days.* IT MISPRINTED, DOUBLE PRINTED, AND TICKETS FAILED TO COME OUT OF THE TERMINAL."

cancellation. Nor does Lee's declaration support the inference that other void transactions occurred on January 17, 1987. To the contrary, the fact that Lee specifically remembered the $5 adjustment but could recall no other such incidents on the day of the drawing supports an inference that there were no others because, had there been, Lee most likely would have recalled them as well.

This brings us to the copy of the request for adjustment submitted by the New Lun Wah Company (where the missing winning ticket was supposedly purchased) to the State Lottery, attached as appendix A, *post*. As we have said, the request for adjustment is the means by which a retailer seeks adjustment for lottery tickets that were not, in fact, issued by the retailer because of error in the retailer's machine. The request on its face seeks adjustment for an error occurring at 1 p.m. whereas the missing winning ticket issued at 3:43 p.m.

Aguimatang argues the request for adjustment may refer to the missing winning ticket because *two* lottery tickets were included with the request when it was sent to the State Lottery. Copies of the two tickets are a part of the record. One is improperly cut off and the other is marked "reprint." The tickets therefore match the explanations on the request for adjustment: "printer's fault"; "cutter's fault." Since there is a coherent and satisfactory explanation for the presence of two tickets in connection with the request for adjustment, there is no reasonable basis upon which to infer that the two tickets resulted from different transactions at 1 p.m. and at 3:43 p.m. The mere presence of two tickets did not create a triable issue of fact.

This brings us to the fact that the handwritten notation "7715988" appears on the upper right hand corner of the request for adjustment. The number is an internal control number assigned by the State Lottery. It does not appear on a ticket. According to the declaration of Aguimatang's attorney, the number was on the copy of the request for adjustment furnished to him by the State Lottery. This is not disputed by the State Lottery. The number "7715988" is the number assigned by the State Lottery to the missing winning ticket. The reasonable inference is that somebody in the State Lottery organization wrote the number on the copy of the request for adjustment furnished to Aguimatang's attorney.[30]

The mere fact that somebody in the State Lottery wrote the transaction number of the missing ticket on the request for adjustment—without more—

---

[30]The original of the request for adjustment was produced at the hearing on the motion but is not included in the record on appeal. The omission is immaterial, since the probative value of the number does not depend upon whether it was written on the original or a copy. Rather, the probative value lies in the origin of the number within the State Lottery.

does not create a reasonable inference that the request for adjustment refers to the missing winning ticket. This is because, as we have explained, an inference must be based upon probabilities, not possibilities. The mere presence of the number does not establish the probability that the request for adjustment embraces the missing winning ticket. Too many other explanations are possible. For example, the number may have been added simply as a clerical device to correlate the request for adjustment with this lawsuit. The presence of the number, in and of itself, created no triable issue of fact.

Nonetheless, the presence of the number of the missing winning ticket on the request for adjustment undeniably tenders the *possibility* that someone in the State Lottery thought the request for adjustment embraced the missing winning ticket. If so, why? Might the retailer have indicated an incorrect time on the request for adjustment, so that, in fact, it referred to the transaction occurring at 3:43 p.m.? The situation is like that encountered by Sherlock Holmes, when he examined a note that was undated, and without either signature or address. Asked by Dr. Watson what the note meant, Holmes responded, "I have no data yet. It is a capital mistake to theorise before one has data. Insensibly one begins to twist facts to suit theories instead of theories to suit facts." (Doyle, A Scandal in Bohemia, in 1 Baring-Gould, The Ann. Sherlock Holmes (2d ed 1970) pp. 350-351.)

More data is what appellants sought. At the hearing on the motion for summary judgment, Aguimatang's attorney sought a continuance to allow the taking of depositions of State Lottery officials, scheduled for that very day, designed to pursue the issue. The trial court denied the motion erroneously concluding it was immaterial whether a valid fourth ticket issued. We conclude the trial court abused its discretion in denying the motion for a continuance.

Code of Civil Procedure section 437c, subdivision (h), provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment . . . that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just."

■ "Generally, power to determine when a continuance should be granted ·is within the discretion of the court, and there is no right to a continuance as a matter of law. [Citation.] However, Code of Civil Procedure section 437c mandates a continuance of a summary judgment hearing upon a good faith showing by affidavit that a continuance is needed to obtain facts essential to justify opposition to the motion." (*Fisher* v. *Larsen* (1982) 138

Cal.App.3d 627, 648 [188 Cal.Rptr. 216], cert. den. (1983) 464 U.S. 959 [78 L.Ed.2d 335, 104 S.Ct. 390].)

■■■■ The circumstances of this case do not suggest that appellants were dilatory in conducting discovery. The request for adjustment was apparently furnished to appellants about the same time that the State Lottery moved for summary judgment on May 16, 1989. The request for continuance was made at the hearing on the motion on June 30, 1989. In any event, as we have said, the trial court did not deny the requested continuance on grounds of lack of diligence but rather upon the erroneous assumption that it was immaterial whether a valid fourth ticket issued. Given the drastic nature of summary judgment, the continuance should have been granted. (*Nazar* v. *Rodeffer* (1986) 184 Cal.App.3d 546, 556-557 [229 Cal.Rptr. 209].)

### DISPOSITION

The judgment is reversed and the matter remanded for proceedings consistent with this opinion. The parties will bear their own costs on appeal.

Carr, Acting P. J., and Nicholson, J., concurred.

Petitions for a rehearing were denied October 21, 1991, and the petition of appellant Arnulfo Melgar Chanquin for review by the Supreme Court was denied January 15, 1992.

APPENDIX A

*2.71578 Y*

CALIFORNIA STATE LOTTERY

## ON-LINE RETAILER REQUEST FOR ADJUSTMENT
PLEASE READ INSTRUCTIONS ON REVERSE SIDE BEFORE COMPLETING THIS FORM

DISTRIBUTION
ORIGINAL/TELLER-HEADQUARTERS
PINK-RETAILER

**ITEM 1**

RETAILER NO.
2 5 8 6 9 1

BUSINESS NAME
*New Lun Joh CO.*

**ITEM 2**

BUSINESS ADDRESS / CITY / ZIP
*1117 Stockton ST. S.F. CA 94133*

**ITEM 3**

RETAILER ACCOUNT NUMBER

CORPORATE STORE NUMBER

BUSINESS TELEPHONE NUMBER
*415 386-0756*

**ITEM 4** MY RECORDS INDICATE THAT: ☐ I OWE THE LOTTERY ☑ THE LOTTERY OWES ME

DOLLAR AMOUNT
*1.00*

DATE ERROR OCCURRED
*01 17 97*

APPROXIMATE TIME
☐ AM ☐ PM

INVOICE DATE
*01 17 97*

**ITEM 5** RETAILER'S STATEMENT:

*Printer's First fault*
*Cutter's First fault*

**ITEM 6**

YOUR NAME (PRINT) SIGNATURE DATE
*Paul Lee* *1/18/97*

DISPOSITION OF REQUEST **FOR LOTTERY USE ONLY** DISPOSITION OF REQUEST

THIS REQUEST FOR ADJUSTMENT FOR $ _____ HAS BEEN ☐ APPROVED FOR $ _____ ☐ DENIED

EXPLANATION:

001638 EXHIBIT 3C