[Crim. No. 1481. Fourth Dist. Aug. 4, 1961.]

THE PEOPLE, Respondent, v. JERRY LEE MAYO,
Appellant.

Plourd & Work for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Vincent W. Thorpe, Deputy Attorney General, for Respondent.

SHEPARD, Acting P. J.—This is an appeal from a judgment of conviction of a violation of Vehicle Code section 20001, and from an order denying defendant's motion for a new trial.

Defendant was charged by the information with three separate crimes, i.e., count 1, assault with a deadly weapon (violation Pen. Code, § 245); count 2, assault by means of force likely to produce great bodily harm (violation of Pen. Code, § 245); count 3, hit and run involving bodily injury (violation of Veh. Code, § 20001). The jury returned verdicts of not guilty as to counts 1 and 2, and a verdict of guilty as to count 3.

## THE SPECIFIC CHARGE

The charging portion of count 3 of the information reads as follows:

"That the said defendant, on or about the 29th day of August, 1960, in said county and state, did drive a certain vehicle, to wit, an automobile, which was involved in an accident resulting in injury to John Franklin Lammons and Jerry Daugherty, *all of which the said defendant then and there well knew,* and the said defendant did then and there wilfully, unlawfully and feloniously fail, neglect and refuse to give to the said John Franklin Lammons and Jerry Daugherty or to any traffic or police officer at the scene of the accident, name and address, and the registration number of said vehicle, and exhibit operator's license, and did then and there fail, neglect and refuse to render all reasonable assistance to the said John Franklin Lammons and Jerry Daugherty, they being then and there in need of assistance by reason of said accident." (Italics ours.)

## FACTS—THE SCENE AT THE DRIVE-IN CAFE

Except in minor detail, there is no essential conflict as to matters material to count 3. The portions necessarily involved in the inquiry as to that count are as follows: Shortly after midnight on the morning of August 29, 1960, an automobile driven by John Lammons, with Jerry Daugherty as a passenger, stopped in the driveway of a drive-in café in El Centro. Both Lammons and Daugherty had imbibed several drinks of

beer and rum coke during the immediately preceding three or four hours. Some kind of altercation, not made entirely clear by the evidence, ensued with other people then at the drive-in. Lammons was struck while in the driver's seat with the engine running. He pressed the throttle, struck another car (Daugherty thought possibly two cars), circled the café, sideswiped a fence, dodged a pedestrian and, without stopping, drove onto Highway 99, thence west on Highway 80. There is no testimony whatever to support any innuendo that he was struck because he was a sailor, nor is there any testimony that he left because he feared further violence. Neither is there any evidence that his previous drinking had obliterated his understanding of his duty to stop.

## FACTS—PURSUIT AND WRECK

Defendant, Jerry Mayo, saw the incident, jumped into his car with four other young men (Charlie Hodges, Wayne Mason, Lawrence Hicks and Mitchell Harper), and pursued Lammons to talk to him. Speeds during the chase varied from 50 to 85 miles per hour, according to different estimates. When Mayo caught up with Lammons, another car driven by William Clark, with Luigi Angelo Tavolazzi as a passenger, was close behind Lammons. According to Clark, Lammons was preventing Clark from passing by swinging in front of Clark whenever Clark started around him on the two-lane road. In attempting to pass Lammons, Mayo's car was sideswiped by Lammons' car, and Mayo was forced off the road, spinning to a stop. Again, Lammons did not stop. The side of Mayo's car was damaged, but it was not disabled. After a quick look at the damage, Mayo again started in pursuit. Again the cars came together, Lammons' car at first contacting the rear portion of Mayo's car, whereupon Mayo's car broadsided in front of Lammons. According to the People's witness (Daugherty), Lammons' car then hit head-on into the side or to one side of the rear portion of Mayo's car, and both cars rolled over one or more times, with injuries to the occupants of both cars. The cars came to rest 50 to 100 feet apart.

## FACTS—THE WRECK SCENE

Almost immediately other cars were at the scene of the wreck. Someone, not identified, helped extricate Daugherty and Lammons from their car, which was upside down. Whether or not any other aid was given to Daugherty and Lammons at the moment they were extricated is not shown. Daugherty, with a bleeding nose and scalp wound, was seated off the edge of the

road, and Lammons, apparently unconscious, lay on his back on the ground with his feet inside the car, when Officer Ronald Creaghe arrived approximately 10 minutes later. Hodges was unconscious, Hicks was injured, Mason and Harper apparently were not injured. At the time Officer Creaghe arrived, Deputy Sheriffs Speer and Friedman were already at the scene. Mayo was gone, but his car with his name on the registration slip, was still there. Creaghe inquired of several unnamed persons at the scene, and later of Hicks, as to who was driving Mayo's car, but did not find anyone who would say. He was at the scene about 30 minutes. He called an ambulance shortly after he arrived, and said he administered aid to Lammons, but did not say of what such aid consisted.

### FACTS—MAYO'S CONDITION AFTER WRECK

A brief synopsis of the testimony of all the various witnesses who knew of Mayo's condition immediately or a short time after the accident, is as follows: Mayo testified his car rolled over and all he could remember was that he got out of the car with a bad headache, felt like he could hardly breathe, was nervous and half-conscious, thinks he remembers getting into another car and going away. For three to five minutes after the accident, Tavolazzi observed Mayo leaning against his car. He was covered with dust, holding his side, and looked stunned. Tavolazzi asked Mayo how he felt. Mayo just looked at him for a moment or two as though he didn't know who he was, but finally said "I'm all right." Tavolazzi moved away, and about one minute later returned, saying to Mayo: "You look like you need to go to the hospital. The doctor will take charge of it. Don will take Charles to the hospital. Why don't you go with him?" Tavolazzi then took Mayo by the arm, "kind of holding him up," and helped him to and into the car driven by Joe Gentry. With Don Seay, Hodges and Hicks, the car then left for El Centro with Gentry driving.

Jerry James saw Mayo for about one minute; he was dirty, limping near his car, did not hear him talk. Gene Gilliland said Mayo appeared in a daze, did not talk, but Gilliland saw nothing wrong with him physically. Mason said Mayo was dirty, bent over holding his leg, looked shocked, surprised, scared, didn't know what to do; thinks Mayo said "Is everybody all right?" Seay said Mayo looked dirty, bent over, groaning; not like himself; may have hollered "Help me" or "Do something." Linda Berduzzi, Mayo's girl friend at whose house Mayo left Gentry's car after the accident, said Mayo

was dirty, complained his head hurt. Estelle Estes, Mayo's mother, to whose home Mayo was taken by Linda Berduzzi sometime later, said Mayo complained that his leg and head hurt, that he wanted to report the matter to the police, that he did not know what happened. Joe Gentry stated Mayo was dirty, not normal, said something about his leg, was holding his leg, not complaining very much, sort of groaning. Daugherty and Hodges did not see Mayo at that time. Hicks and Harper were not interrogated on this point.

Somewhere along the way to El Centro, Mayo decided. to go to his girl friend's home, and he was dropped off there, from whence he was taken to his mother's home. At 5:15 a. m. he reported to the police headquarters in El Centro, having learned by telephone that that office was searching for him.

### DEFICIENCIES IN EVIDENCE

Some peculiar and puzzling phases of the evidence are apparent. Whether Deputy Sheriffs Speer and Friedman arrived before Mayo left, whether they talked to Mayo there, whether they called an ambulance, whether or not they rendered first aid and decided Lammons and Daugherty were best left where they were until an ambulance arrived, are all unanswered. Since they were apparently the first officers at the scene, they should have been better informed on the details involving a possible violation of Vehicle Code section 20001 than Officer Creaghe, yet they were not called as witnesses. It is clear that investigating Officer Creaghe knew that they had arrived at the scene before he did, but the record does not show that Mayo knew of their existence as potential witnesses until Creaghe testified at the trial. A companion officer accompanied Creaghe to the scene of the accident. What such companion officer saw or heard was not presented. He was not called as a witness. Again, the record does not show that defendant knew of this potential witness until Creaghe testified. No medical testimony was produced to show the real nature of anyone's injuries, nor what "reasonable assistance" (Veh. Code, § 20003) would have amounted to medically under the circumstances.

Neither Mayo nor any of the other numerous witnesses were ever asked whether or not Mayo had left his name and address with anyone at the scene. The nearest approach to this was Creaghe's testimony as to his attempt to secure the name of the driver from Hicks and from other unnamed persons. Here, again, however, the particular point of whether or not Mayo had, in fact, left his name and address was never

asked of anyone. Obviously, those who arrived after the collision could only surmise or guess who the driver was. The registration slip was in the car with the name and address of Mayo on it. The pique of Officer Creaghe at not receiving voluntary suggestions as to probabilities is understandable, but the record does not show that he asked the question of anyone as to whether the driver had left a name and address.

At the trial, neither Mayo nor any of the numerous witnesses were ever asked whether or not Mayo knew that other persons were injured. It is perfectly clear that eventually Mayo knew that Hodges and Hicks were injured, for they were in the car with him going to the hospital, but they already knew him and knew he was the driver of the car. There was no object in giving them any information. The last he saw of them, they were in good hands and were being taken to the hospital.

Neither Mayo nor any of the other witnesses were ever asked a question about whether Mayo saw another car wrecked at the scene. No question was even asked which would place Mayo where he would probably have seen the Lammons car in a wrecked position. This was during the nighttime. How the headlights of the various cars were pointed, what they revealed, what objects were in shadow or darkness or in the light, were never brought to the attention of the jury. This deficiency in the evidence assumes more marked importance when it is remembered that on the first sideswipe at the drive-in Lammons fled without stopping, and on the second sideswipe Mayo's car spun to a stop but Lammons' car again sped away without stopping. There is nothing whatever in the evidence to show that Mayo, at the time he left the final scene, did not logically believe this had happened again. The facts in the case at bar bear no resemblance to that of *People* v. *Moody*, 93 Cal.App.2d 66 [208 P.2d 692], in which the accident occurred in broad daylight with the driver of the injured car talking to the defendant so that it was perfectly obvious that the defendant knew of the wreck and the probability of others therein being injured.

Just why these various witnesses were not called, and why the really cogent questions were never asked, is hard to understand, except on the assumption that the primary approach of the prosecution was directed toward the assault charges. The general trend of the testimony gives some indication to that effect. However, the jury rejected both assault charges, although there was some direct testimony from Lammons and

534

Daugherty which, if believed, might possibly have supported such charge. Thus, the jury must have given at least some credence to the defense witnesses on a subject on which there was contrary testimony by prosecution witnesses. Even though from the sum total of the evidence it may be said to be reasonably inferable that Mayo did not affirmatively leave his name and address, nevertheless it is difficult to understand the acceptance by the jury of defense witnesses' testimony relative to assault, and its rejection on the question of knowledge, unless the jury in some way misunderstood the instructions. Furthermore, an inference based solely on surmise, conjecture or guessing cannot be used to supplant a necessary element of the corpus delicti. Here there is no evidence of knowledge, nor even any attempt to develop circumstantial evidence from which Mayo's knowledge might be inferred.

### FALSEHOOD

 Evidence was produced that Mayo, after cleaning himself up at home, again dirtied his face and put on a torn shirt before reporting, telling the officers he had wandered into a field after the accident. This falsehood practiced by Mayo when he came to the police headquarters with dirt on his face and torn shirt, was, of course, reprehensible and might well have bolstered and corroborated affirmative proof of guilt. However, it must be remembered that as far as Mayo was concerned, any feeling of possible guilt was just as strongly consistent with the possibility of his being charged with a violation of Vehicle Code section 23103 (reckless driving), or with a violation of Vehicle Code section 20002 (duty on injury to property). In fact, the only comment of Officer Creaghe, after questioning Mayo, was to tell Mayo there was a *possibility* that he would be charged with reckless driving.

 While it is true that a wilful falsehood by the defendant on a matter materially connected with the offense charged may produce a strong suspicion of guilt or, under some circumstances, even an admission of guilt (*People* v. *Osslo*, 50 Cal.2d 75, 93 [4] [323 P.2d 397]), it cannot be used to supplant or take the place of an entire lack of evidence on an essential ingredient of the corpus delicti. In the case here at bar, knowledge that the automobile with which he collided was, in fact, wrecked, and, in addition, knowledge that some person in said other car was injured in the accident, must be brought home to Mayo before the evidence is sufficient to support a conviction. (*People* v. *Rallo,* 119 Cal.App. 393,

401 [5] [6 P.2d 516]; *People* v. *Wallace*, 2 Cal.App.2d 238, 243 [5] [37 P.2d 1053]; *People* v. *Pahner*, 10 Cal.App.2d 294, 298 [3] [51 P.2d 1143]; *People* v. *Scofield*, 203 Cal. 703, 711 [6] [265 P. 914].) Under this condition of the evidence, the mere fact of falsehood, even though treated as an admission, does not supply the missing element. (*People* v. *Amaya*, 40 Cal.2d 70, 75 [2] [251 P.2d 324]; *People* v. *Mehaffey*, 32 Cal.2d 535, 544 [1] [197 P.2d 12]; *People* v. *Seymour*, 54 Cal. App.2d 266, 275 [6] [128 P.2d 726]; *People* v. *Price*, 175 Cal.App.2d 857, 861 [7] [1 Cal.Rptr. 57]; *People* v. *Draper*, 69 Cal.App.2d 781, 785 [3], 786 [4] [160 P.2d 80].) In the *Osslo* case the corpus delicti was fully proved by other evidence.

### KNOWLEDGE ESSENTIAL

■ Knowledge by Mayo that another car involved in the accident was wrecked and that some other party therein had been injured in the accident charged is clearly an essential ingredient of proof by the prosecution in order to establish guilt of this defendant under Vehicle Code section 20001. Clearly, the word "wilful" necessarily implies knowledge. (*People* v. *Kuhn*, 139 Cal.App.2d 109, 112 [4] [292 P.2d 964]; *People* v. *Leutholtz*, 102 Cal.App. 493, 498 [6] [283 P. 292]; *People* v. *Rallo*, *supra*; *People* v. *Scofield*, *supra*; *People* v. *Campbell*, 162 Cal.App.2d 776, 785 [5] [329 P.2d 82].) ■ Of course, knowledge, like other facts, may be proved by circumstantial evidence (*People* v. *Kuhn*, *supra*; *People* v. *Dallas*, 42 Cal.App.2d 596, 601 [1] [109 P.2d 409]), but the burden of proof to establish each element of the corpus delicti is upon the prosecution. (*People* v. *Whitehead*, 113 Cal.App.2d 43, 52 [247 P.2d 717]; *People* v. *Wong Sang Lung*, 3 Cal.App. 221, 223 [84 P. 843]; *People* v. *Kovacevich*, 19 Cal.App.2d 335, 338 [1] [65 P.2d 807]; *People* v. *Keene*, 128 Cal.App.2d 520, 527 [11] [275 P.2d 804]; *People* v. *Draper*, *supra*.)

■ We recognize the well-established rule that, on appeal, the evidence must be received in the light most favorable to the verdict and all proper inferences must be indulged to support it. (*People* v. *Newland*, 15 Cal.2d 678, 680 [1] [104 P.2d 778]; *People* v. *Love*, 53 Cal.2d 843, 850 [1-2] [350 P.2d 705].) However, an inference may not be based on mere surmise or conjecture (*People* v. *Flores*, 58 Cal.App.2d 764, 770 [6] [137 P.2d 767]; *People* v. *Draper*, *supra*, p. 786 [5]; *Krause* v. *Apodaca*, 186 Cal.App.2d 413, 418 [7] [9 Cal.Rptr.

10]), nor on mere possibility. It must be based on probability. (*People* v. *Berti*, 178 Cal.App.2d 872, 876 [8] [3 Cal.Rptr. 51].)

In view of the complete lack of any direct evidence or even questions on the subject of his knowledge, and the complete lack of any direct evidence or even questions on what Mayo could or should have seen under the nighttime conditions there present, we cannot say that such elements are established by either direct or circumstantial evidence. We are compelled to conclude that the evidence was insufficient to support the verdict.

## INSTRUCTION ON FAILURE TO STOP

Defense counsel charges that the jury were prejudicially confused by the giving of an independently complete instruction on failure to stop. This contention is based on the fact that Mayo was not charged with failure to stop, and such instruction may well have led the jury to believe that he was so charged, and that the court believed there was some evidence to support such charge. Ordinarily the giving of such a surplus instruction is not necessarily prejudicial, even though erroneous. However, in view of the dearth of evidence in other respects, as above pointed out, it seems entirely probable that the jury misunderstood the instructions in some respect. There can be no question that giving the instruction was error. The sole question is whether or not it was prejudicial. We think it may well have been. (*People* v. *Silver*, 16 Cal. 2d 714, 721, 723 [7-8] [108 P.2d 4]; *People* v. *Savinovich*, 59 Cal.App. 240, 244 [3] [210 P. 526]; *People* v. *Roe*, 189 Cal. 548, 558 [2] [209 P. 560]; *People* v. *Sanchez*, 30 Cal.2d 560, 572 [7] [184 P.2d 673].)

## SPECIFIC INSTRUCTIONS ON ASSISTANCE AND KNOWLEDGE

Defense counsel also charges that while the general instructions were technically sufficient in their over-all character, nevertheless the court erred in refusing to give two instructions requested by defense counsel. The first was to the general effect that a defendant is not required to render assistance to other individuals where such individuals are being adequately cared for by others. The second was to the effect that if a defendant's mental condition at the scene of the collision is such that he is unable to know what is going on or what has occurred, he cannot be found guilty. The court did give general instructions incorporating the words "knowingly" and "wilful," and other factors which would ordinar-

ily be sufficient. However, in view of the condition of the evidence as above outlined, we think Mayo was entitled to have the specific instructions given as requested. They may not have been as skillfully worded as might have been desired, but they pin-pointed to the jury the direct idea that defendant's knowledge was an important and essential element of proof, and they did not transcend the meaning of the law. (*People* v. *Granados,* 49 Cal.2d 490, 495 [6] [319 P.2d 346]; *People* v. *Kane,* 27 Cal.2d 693, 698 [1] [166 P.2d 285].) As was said in *People* v. *Cook,* 148 Cal. 334, 347 [83 P. 43], respecting rejection of a pointed instruction where a generally sufficient instruction has been given: "It is true that the instruction given stated the law correctly; but it was brief, general, and colorless in comparison with the instruction asked, and had the effect of minimizing the importance of a consideration which could not have been stated with too much emphasis. The instruction as asked should have been given."

Again, we are unable to account for the verdict except on the theory of a misunderstanding of the instructions by the jury. Being of that view, we are compelled to the belief that the failure to give the pin-pointed instructions requested was prejudicial. As was quoted in *People* v. *Flores, supra,* page 770 [1c]: " 'Though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust and dangerous to the whole community.' [Citation.] . . . The acquittal of a guilty person is truly a miscarriage of justice, but the conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned, would be a tragedy."

The judgment is reversed.

Coughlin, J., concurred.

A petition for a rehearing was denied August 24, 1961.