Filed 6/30/23  P. v. Thomas CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078797 |
| v. | (Super.Ct.No. RIF1902665) |
| LARRY MAURICE THOMAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy J. Hollenhorst, Judge.  Affirmed.

Mark Alan Hart, by appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel J. Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Following a bench trial, the trial court found defendant and appellant Larry Maurice Thomas guilty as charged of second degree murder (Pen. Code, § 187, subd. (a); count 1) and failing to stop at the scene of an injury accident (Veh. Code, § 20001, subd. (a); count 2).[1]  The court also found that the accident resulted in death, making defendant's conviction in count 2 a felony, punishable by two, three, or four years in state prison.  (Veh. Code, § 20001, subd. (b)(2), Pen. Code §§ 17, subd. (a), 1170, subd. (a)(3).)  On March 30, 2022, the trial court sentenced defendant to 19 years to life in state prison—the upper term of four years on count 2, the principal count, plus a consecutive, indeterminate term of 15 years to life on count 1.

In this appeal, defendant raises two claims of error concerning his conviction and sentence in count 2.  First, he claims insufficient evidence supports the knowledge element of the conviction.  He argues no evidence shows he knew or reasonably should have known that another person was injured in the accident because his left arm was injured, he was intoxicated and disoriented after the accident, and he left the scene in order to get medical attention.  We reject this claim.  Substantial evidence shows that defendant was conscious and coherent after the accident and, based on the nature of the accident, he reasonably should have known that another person was injured.

Second, defendant claims the trial court erroneously sentenced him to the upper term of four years on count 2 because the court did not state on the record that all of the

---

[1]  The parties waived their rights to a jury trial.

2

factors the court relied on in selecting the upper term were proved to the court beyond a reasonable doubt. (See Pen. Code, § 1170, subd. (b)(2), (5).) We reject this claim of sentencing error. Additionally, the parties agree that defendant's indeterminate abstract of judgment must be corrected to show that defendant was convicted of second degree murder, not first degree murder, in count 1. We remand the matter with directions to correct this error and affirm the judgment of conviction and sentence in all respects.

## II. FACTS AND PROCEDURE

A. *Prosecution Evidence*

Around 8:20 p.m. on June 20, 2019, defendant was driving southbound on Interstate 215, a black Chevy Tahoe, when the Tahoe collided with a big rig truck driven by R. Ferguson. The Tahoe and the cab of the big rig rolled over multiple times and landed on their rooftops on the center divider guardrail. Defendant's left arm was injured in the accident. R. Ferguson died at the scene.

Before the collision, defendant and his brother, Romel, were at their mother's house in Riverside, near Alessandro Boulevard. The brothers left the house in separate cars. Romel; his fiancé, Ms. Wilson; and his two-year old son left the house in Romel's Mercedes, with Wilson driving the Mercedes. Defendant was driving his sister's black Chevy Tahoe, with no passengers.

L. Lopez, who was driving on Alessandro Boulevard toward Interstate 215, saw the Tahoe speeding and swerving in and out of lanes, nearly hitting Lopez's car. The Tahoe then entered the southbound Interstate 215 onramp, traveling faster than other cars. Lopez entered the onramp behind the Tahoe and did not witness the collision. But once

Lopez was on the freeway, she saw that the big rig and the black Chevy Tahoe had "crashed" on the center divider.

Lopez saw two people run from the accident scene to a car parked on the right side of the freeway, then the car "took off," and the people who ran to the car did not return to the scene. Lopez called 911, parked her car, and ran over to the big rig. Two other people were already at the big rig, helping Ferguson. Ferguson appeared to be trapped behind or beneath the passenger's seat in the overturned cab of the big rig. Lopez held Ferguson's hand while several people, with fire extinguishers, tried to put out a fire that had started beneath the big rig.

As indicated, the collision occurred at approximately 8:20 p.m. California Highway Patrol Officer M. Chapman arrived on the scene at 8:34 p.m., and Ferguson was pronounced dead at 8:42 p.m. Ferguson died from traumatic positional asphyxia, meaning he was unable to breathe and suffocated in the overturned cab of the big rig. He also suffered rib fractures, which further impeded his ability to breathe and contributed to his death.

B. Sanchez was driving southbound on Interstate 215 when he saw the Tahoe and the Mercedes speeding and changing lanes, shortly before the Tahoe hit the big rig and caused the collision. The Tahoe and the Mercedes were being driven erratically and appeared to be racing and "chasing each other." Just before the collision, the Mercedes was in the number two lane, approaching the back of the big rig, then the Mercedes moved into the number one lane, "cut[ting] . . . off" the Tahoe. Without slowing down,

4

the Tahoe moved to the left shoulder, sped up, tried to pass the Mercedes, then lost control.[2]

When it lost control, the Tahoe swerved back into the number one lane behind the Mercedes, then the Tahoe hit the cab of the big rig, which was traveling in the number two lane at 55 miles an hour. The Tahoe and the big rig rolled over multiple times, and the trailer unhooked from the cab of the big rig. The Tahoe and cab came to rest on their rooftops, on the center divider guardrail, and the trailer came to rest in the number one and two lanes. "Precrash data" from the Tahoe's airbag control module showed the Tahoe was driving at 93 miles an hour three seconds before the collision, and that the Tahoe's brakes were not engaged sufficiently to illuminate the brake lights between one and five seconds before the collision.

Sanchez stopped at the scene to render assistance and later identified defendant from a photo lineup as the driver of the Tahoe. J. Miller was driving northbound on Interstate 215 when he saw a cloud of dust and also stopped at the scene. Sanchez went to the big rig, while Miller, Romel, and several others pulled defendant out of the Tahoe. Miller saw that defendant was bleeding and "trying to figure out what was going on."

Romel testified[3] that Ms. Wilson pulled the Mercedes over to the right side of the freeway after Romel saw that the Tahoe was involved in the collision. Romel helped get

---

[2] There was dirt and gravel on the left shoulder in contrast with the "clear road condition[s]" in the number one lane.

[3] Romel was ordered to testify under a grant of use immunity after he invoked his Fifth Amendment right not to incriminate himself by testifying.

5

defendant out of the Tahoe, then Romel drove defendant in the Mercedes to what he claimed was "the nearest hospital." Defendant's left arm was bleeding and the veins in his arm were visible. Defendant was holding his back, he would not respond to Romel, and he appeared "unaware" of what had happened just after he was pulled out of the Tahoe. Defendant's cell phone and wallet were left in the Tahoe. Romel drove defendant to Arrowhead Regional Medical Center in Colton. When they arrived, Romel did not help defendant get into the hospital or go inside the hospital with defendant. Romel denied that Wilson and defendant were racing in the Mercedes and Tahoe.

Officer Chapman testified that, when he arrived on the scene at 8:34p.m., the driver of the Tahoe was not at the scene. Officer Chapman had dispatch check with local hospitals, and none of them indicated that anyone from the Tahoe had checked in. Defendant's wallet, containing his driver's license and credit and debit cards, were found on the ground next to the Tahoe when the vehicle was turned upright. An empty beer can was found on the floorboard of the Tahoe between the front and rear passenger seats. There appeared to be blood on the Tahoe's driver's side door.

At 9:58 p.m., approximately 90 minutes after the accident, defendant arrived at Arrowhead Regional Medical Center in Colton. S.M., an emergency room (ER) nurse working in the trauma department, treated defendant for an injury to his left hand, wrist, and forearm. Defendant was "very loud" and uncooperative with the trauma staff when he entered the trauma bay in a wheelchair. When asked his name, he responded with obscenities. He appeared to be intoxicated, but he was coherent. S.M., who was trained

6

in how to observe and handle intoxicated patients, believed defendant's behavior was due to his being under the influence of alcohol or another other substance.

Defendant told two inconsistent stories when asked how he suffered the injury to his left arm. First, he told S.M. he had fallen off a dirt bike that he was driving. Then, when S.M. asked him where "all the dirt" was, defendant said he had fallen off the back of a dirt bike he was riding. Neither answer was consistent with defendant's injury. Defendant continued to yell obscenities and did not calm down for more than two hours after he arrived at the hospital. Around 12:30 a.m., two and one half hours after he arrived at 9:58 p.m., defendant was found standing naked on a gurney, with all of his cardiac leads off, hanging from and attempting to pull down a large surgical light fixture attached to the ceiling, while screaming and yelling. He appeared to understand when S.M. was telling him to stop, but he did not stop until after he was repeatedly asked to do so and S.M. and her partner physically removed his fingers from the light fixture.

On the night of the accident, law enforcement officers went to the address of the registered owner of the Tahoe and spoke with two of defendant's sisters, including the sister who owned the Tahoe. The other sister reported that defendant was living with her and gave the officers her address. On the next day, June 21, 2019, an officer went to that address and was told defendant was at Arrowhead Regional Medical Center. The officer then contacted defendant at Arrowhead Regional Medical Center on June 21. At that time, defendant had been treated for his injuries but had not reported the accident.

A blood sample taken from defendant at 10:10 p.m. on June 20, 2019, showed his blood ethyl alcohol content was 0.144 percent. An adult male of defendant's height and

7

weight with a 0.144 percent blood ethyl alcohol content at 10:10 p.m. would have had a

blood ethyl alcohol content of 0.159 to 0.174 at 8:27 p.m. (near the time of the accident)

if the male had consumed no alcohol after 8:27 p.m. A person with a blood alcohol

content of 0.08 or higher is considered impaired for purposes of driving. The blood

sample also showed breakdown products of the active component of marijuana, and an

inactive marijuana metabolite that does not contribute to the drug's psychoactive and

psychomotor effects, in quantities indicating that defendant likely used marijuana within

several hours of the blood draw.

A forensic toxicologist testified that alcohol and marijuana, in combination, can

affect a person's ability to operate a motor vehicle more than either alone. Both alcohol

and marijuana affect a person's divided attention skills and slow a person's ability to

process information. Thus, alcohol and marijuana can affect a person's judgment and

memory, and can impair a person's ability to control and maintain the appropriate speed

of a vehicle. Some people may also become angry, aggressive, and argumentative after

consuming alcohol. But a person whose driving may be impaired due to alcohol and

marijuana consumption may still be able to think, comprehend information, and make

decisions.

The parties stipulated that defendant had a 2016 conviction in Los Angeles County

for driving under the influence (DUI), a Vehicle Code violation. Defendant was arrested

after he was observed at 1:59 p.m., on April 2, 2016, driving a vehicle, crossing over

double yellow lines, entering an opposite lane, passing another vehicle, and reentering his

original lane of travel. He then stopped at a stop sign with his rear tires beyond the limit

line. He claimed he had not consumed any alcohol since 3:00 a.m. that morning, but a device he blew into at 4:09 p.m. and 4:12 p.m. showed that his blood alcohol content was then 0.14 to 0.15 percent.

In September 2018, defendant completed a first offender MADD (Mothers Against Drunk Driving) program, pursuant to a court order in his Los Angeles County DUI case. The 90-minute class included a "Watson advisement" (*People v. Watson* (1981) 30 Cal.3d 290), telling attendees they now knew that driving under the influence of alcohol or drugs was dangerous, and if they committed the crime again and killed someone, they could be charged with second degree murder and be sentenced to 15 years to life in prison.

B. *Defense Evidence*

A deputy county coroner who responded to the scene did not notice any beer cans in the Tahoe when she took pictures of the Tahoe when it was upside down.

### III. DISCUSSION

A. *Defendant's Challenges to His Conviction in Count 2 Lack Merit*

The court found defendant guilty as charged in count 2 of leaving the scene of an accident resulting in injury or death to another person. (Veh. Code, § 20001, subds. (a), (b)(2)). Defendant claims the evidence is insufficient to support the knowledge element of the offense—that he knew or reasonably should have known that the accident resulted in injury or death to another. He claims insufficient evidence shows he willfully failed to comply with the duties imposed by Vehicle Code section 20001, subdivision (a), because he was injured, intoxicated, and disoriented after the accident. He further claims that

9

"case law extending the duties beyond the scene of the collision should be reconsidered as inconsistent with the plain language" of Vehicle Code section 20001, subdivision (a). We find no merit to these claims.

    1.  Applicable Vehicle Code Provisions

    Vehicle Code section 20001 states:  "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004."  (Veh. Code, § 20001, subd. (a).)  If the accident results in death, the offense is punishable as a felony, and the defendant may be sentenced to state prison for two, three, or four years.  (Veh. Code § 20001, subd. (b); Pen. Code, § 17, subds. (a), (b).)

    Vehicle Code section 20003 requires the driver of a vehicle involved in an injury accident to provide information at the scene and, if necessary, render reasonable assistance to any injured persons.  (*People v. Harbert* (2009) 170 Cal.App.4th 42, 45.)  It states:  "The driver of any vehicle involved in an accident resulting in injury to or death of any person shall also give his or her name, current residence address, . . . the registration number of the vehicle he or she is driving, and the name and current residence address of the owner to the person struck or the driver or occupants of any vehicle collided with, and shall give the information to any traffic or police officer at the scene of the accident.  The driver also shall render to any person injured in the accident reasonable assistance, including transporting, or making arrangements for transporting, any injured person to a physician, surgeon, or hospital for medical or surgical treatment if

10

it is apparent that treatment is necessary or if that transportation is requested by any injured person." (Veh. Code, § 20003, subd. (a).)

Vehicle Code section 20004 requires the driver to report an accident resulting in death "without delay" if there is no traffic or police officer at the scene to whom to give the information required by Vehicle Code section 20003. It states: "In the event of death of any person resulting from an accident, the driver of any vehicle involved after fulfilling the requirements of this division, and if there be no traffic or police officer at the scene of the accident to whom to give the information required by Section 20003, shall, without delay, report the accident to the nearest office of the Department of the California Highway Patrol or office of a duly authorized police authority and submit with the report the information required by Section 20003." (Veh. Code, § 20004.)

2. The Knowledge Element of a Vehicle Code Section 20001 Violation

The duty to stop and render reasonable assistance under Vehicle Code section 20001 has long been interpreted as requiring constructive, rather than actual, knowledge that another person was injured in the accident. In 1965, our Supreme Court held that the statute required a showing that the defendant had constructive knowledge based on the circumstances of the accident that the accident resulted in injury to another, but the statute did not require a showing that the defendant actually knew that another person had been injured. (*People v. Holford* (1965) 63 Cal.2d 74, 80 (*Holford*).) *Holford* disapproved previous cases, including *People v. Mayo* (1961) 194 Cal.App.2d 527 (*Mayo*), in which the courts had indicated that a defendant's actual "knowledge of injury" was an "essential element" of a Vehicle Code section 20001 violation (*Holford*, at p. 80).

11

*Holford* explained that proof of the defendant's knowledge of injury "usually" must be "derived from the surrounding facts and circumstances of the accident. [Citation.] Yet the driver who leaves the scene of the accident seldom possesses actual knowledge of injury; by leaving the scene[,] he forecloses any opportunity to acquire such actual knowledge. Hence, *a requirement of actual knowledge of injury would realistically render the statue useless*. We therefore believe that criminal liability attached to a driver who knowingly leaves the scene of an accident if he actually knew of the injury *or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person*." (*Holford*, *supra*, 63 Cal.2d at p. 80, italics added.)

Thus, the knowledge element of a Vehicle Code section 20001 violation requires proof that the defendant knew two things: (1) the defendant was involved in an accident, and (2) the accident resulted in injury to another person. (*People v. Harbert*, *supra*, 170 Cal.App.4th at pp. 54-55.) But the defendant's knowledge of these facts may be "constructively established" by circumstantial evidence—that is, by the circumstances of the accident, and need not be established by the defendant's statements acknowledging that the accident resulted in injury to another. (*Id*. at p. 55; *People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1238 ["[A]ctual knowledge is not required" to prove a Vehicle Code section 20001 violation.].)

3. Standard of Review for Substantial Evidence Claims

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the

defendant guilty beyond a reasonable doubt. [Citation.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

" ' " 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] " 'Although it is the duty of the jury [or court] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury [or court], not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278.) Reversal of a judgment for insufficient evidence is unwarranted unless "it . . . clearly appear[s] that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) " 'Substantial evidence

includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

4. Substantial Evidence Shows Defendant Knew Another Person Was Injured

Defendant claims his injuries, intoxication, and disorientation immediately after the accident prevented him from realizing that another person had been injured in the accident. He notes he was "pulled out of the [Tahoe] . . . bleeding from his arms," he was unresponsive, he was holding his back, and the veins and bones on his arm were visible. He claims he left the scene because he was "injured and required medical assistance," and that the combination of alcohol and "marijuana in his system" affected his decision-making process, judgment, and memory, and caused him to be confused and unaware anyone else had been injured in the accident. He argues "[h]is injuries, combined with being under the influence of alcohol or drugs . . . prevented him from willfully complying with the duties listed in . . . section 20001."

These arguments are unavailing because they disregard substantial, circumstantial evidence that defendant knew, immediately after the accident, "that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*Holford*, *supra*, 63 Cal.2d at p. 80; Veh. Code, § 20001, subd. (a).) For several reasons, substantial evidence supports the court's implied finding that defendant, beyond a reasonable doubt, was aware of the accident and left the scene knowing that the driver and any passengers in the big rig had likely been injured or killed.

First, the evidence shows defendant was conscious and aware of his surroundings after he was pulled out of the Tahoe and before he left the scene. (*People v. Scofield*

14

(1928) 203 Cal. 703, 708 [When a driver is rendered unconscious by an accident, the driver is not criminally liable for failing to comply with Vehicle Code section 20001.].) Only minutes after the accident, defendant was pulled out of the Tahoe, then walked across the freeway with Romel to Romel's Mercedes, and left the scene. Defendant was not treated for a head injury after the accident; he was only treated for the injuries to his left arm. And, when he arrived at Arrowhead Reginal Medical Center in Colton after the accident, he spoke coherently, although he was belligerent and intoxicated, and he later began behaving erratically.

Romel testified that defendant was "unaware" of what had happened after he was pulled out of the Tahoe, and Miller, who helped pull defendant out of the Tahoe, saw that defendant was "trying to figure out what was going on." But substantial evidence shows that defendant's "disorientation" after he was pulled out of the Tahoe was momentary and did not last. Defendant was able to walk to Romel's Mercedes and leave the scene shortly after he was pulled out of the Tahoe.

A defendant who acts in an apparent state of consciousness is presumed to be conscious, and the burden is on the defendant to produce evidence rebutting the presumption. (*People v. James* (2015) 238 Cal.App.4th 794, 804.) Defendant acted in an apparent state of consciousness after the accident, and he presented no evidence at trial to rebut the presumption that he was conscious after the accident. His actions at the scene of the accident and his actions and statements at the hospital support a reasonable inference that he was consciously aware of the accident and that another person had likely been injured or killed in the accident. (*Holford*, *supra*, 63 Cal.2d at p. 80.)

15

Second, defendant's arrival at Arrowhead Regional Medical Center in Colton, around 90 minutes after the accident, supports a reasonable inference that defendant was aware of the accident, that the driver and any passengers in the big rig had likely been injured, and that defendant was trying to avoid responsibility for the accident. Romel testified that he took defendant to the "nearest hospital," but the prosecution showed that the nearest hospital, and several others, were much closer to the accident than Arrowhead Regional Medical Center. In addition, Romel did not go to the trauma center with defendant to explain how defendant had been injured, and defendant told two inconsistent stories and lied to hospital staff about the cause of his injuries.

Third, substantial evidence shows defendant's "disorientation" after the accident was due entirely to defendant's voluntary intoxication. Defendant's blood alcohol content was between .15 and .17 at the time of the accident. Voluntary intoxication is not a defense to a general intent crime. (*People v. James*, *supra*, 238 Cal.App.4th at p. 805.) A violation of Vehicle Code section 20001 is a general intent crime; it does not require specific intent to leave the scene of an accident resulting in injury without providing information or rendering assistance. (*People v. Henry* (1937) 23 Cal.App.2d 155, 165-166 ["Knowledge means acquaintance with fact; the act or state of understanding. Intent is defined as intending or purposing."].)

In sum, the court could have reasonably concluded, beyond a reasonable doubt, that defendant knew, as he was leaving the scene of the accident, that a big rig had overturned in the accident and that its driver and any passengers had likely been injured or killed. Defendant himself had been injured, and there was every reason to believe that

16

the driver of the overturned tractor-trailer had also been injured or even killed. Based on the entire record, the court reasonably concluded that the prosecution met its burden of proving the knowledge element of the charge in count 2 of leaving the scene of an injury accident. (Veh. Code, § 20001, subd. (a).)

    5. <u>Defendant Failed To Report the Accident As Soon As Reasonably Possible</u>

The People argue that, even if defendant was unable to comply with Vehicle Code section 20001 at the scene of the accident, he violated the statute by failing to report the accident as soon as he was reasonably able to do so. We agree.

On this point, *People v. Flores* (1996) 51 Cal.App.4th 1199 (*Flores*) is instructive. The defendant, Flores, was rendered unconscious for one to six minutes after she backed her vehicle into another vehicle traveling on a highway. (*Id*. at p. 1202.) After Flores regained consciousness, she was helped out of her vehicle, given some water to drink, and told she needed to return to the scene of the accident. (*Ibid*.) Flores did not return to the scene and was arrested five days later. (*Ibid*.} Flores testified she did not recall the accident, but after the accident her friend told her she had been in an accident with another car, and that "someone might be very badly hurt or even dead." (*Id*. at p. 1203.) Still, Flores did not report the accident, and was apparently attempting to flee to Mexico with her belongings when she was arrested. (*Ibid*.)

In appealing her conviction for violating Vehicle Code section 20001, subdivision (a), Flores claimed she did not violate the statute because she "remained unconscious until after the accident scene was cleared." (*Flores*, *supra*, 51 Cal.App.4th at pp. 1203-

17

1204.)  She argued that the duty to stop and provide information under Vehicle Code sections 20001 and 20003 only applied at the scene of the accident.  (*Id*. at p. 1206.)

The *Flores* court disagreed, reasoning, "Section 20001 requires a driver involved in an injury accident to do two things:  stop and fulfill the requirements of section 20003.  Neither statute expressly limits the time or place for fulfilling the requirements of section 20003 to the scene of the accident. . . .  Implicit in both statutes is the obligation of the driver to fulfill their requirements as soon as reasonably possible."  (*Flores*, *supra*, 51 Cal.App.4th at p. 1204.)  The court further explained, "there is nothing in the sections that so limits the duty of the driver to identify herself," and no case law holding that the statutes were "so limited."  (*Id*. at p.1206.)  Thus, the court held, "a driver who is unconscious at the scene of an injury accident may violate sections 20001 and 20003 if she fails to provide identifying information as soon as reasonably possible after regaining consciousness."  (*Id*. at pp. 1201, 1206.)

Here, too, defendant had a duty to report the accident as soon as it was reasonably possible for him to do so.  Unlike the defendant in *Flores*, defendant did not lose consciousness in the accident.  But, assuming the injuries to defendant's left arm or the shock of the accident rendered defendant unable to stop at the scene, provide identifying information, and render reasonable assistance (Veh. Code, §§ 20001, 20003), defendant nonetheless had a duty to report the accident and provide the information required by Vehicle Code section 20003 as soon as it was reasonably possible for him to do so after the accident (*Flores*, *supra*, 51 Cal.App.4th at pp. 1201, 1205-1206).  The record shows that defendant reasonably could have, but failed, to report the accident and provide the

18

required information no later than the day after the accident, after defendant had been treated for his left arm injuries and was still at Arrowhead Regional Medical Center.

Defendant claims *Flores* "should be reconsidered as inconsistent with the plain language" of Vehicle Code section 20001, subdivision (a). He argues that, under the plain language of the statute, he had no duty to comply with the statute *after* the accident given that he was injured, intoxicated, and disoriented, and therefore unable to comply at the scene. He argues that *Mayo*, *supra*, 194 Cal.App.2d 527 "provides a better reasoned analysis" than *Flores*, "albeit in dicta."

*Mayo* does not assist defendant. *Mayo* concluded there was insufficient evidence that the defendant knew that another vehicle had been involved in the accident or that another person had been injured. (*Mayo*, *supra*, 194 Cal.App.2d at pp. 535-536.) This conclusion was sufficient to reverse the defendant's conviction for violating Vehicle Code section 20001. But, in dicta, the court went on to conclude that the trial court prejudicially erred in refusing to give a defense-proffered jury instruction "to the effect that if a defendant's mental condition at the scene of the collision is such that he is unable to know what is going on or what has occurred, he cannot be found guilty." (*Mayo*, at pp. 536-537.) *Flores* noted that this part of *Mayo* was dicta, and, moreover, that *Mayo* "did not consider the question" presented in *Flores*, "whether a driver who is unconscious at the scene of the accident has a duty to identify herself after the accident scene is cleared. A case is not authority for matters not discussed." (*Flores*, *supra*, 51 Cal.App.4th at p. 1205.)

19

Defendant argues that *Flores's* interpretation of Vehicle Code section 20001, as requiring compliance with Vehicle Code section 20003 as soon as is reasonably practicable after the accident, is inconsistent with the plain language of Vehicle Code section 20001, which requires the driver to "immediately stop the vehicle at the scene of the accident" and "fulfill the requirements of Sections 20003 and 20004." Defendant argues "[t]he word 'immediately' should be interpreted according to its ordinary meaning. It should not be interpreted by courts to extend the driver's duty to a time and place beyond the scene of the accident. . . . [I]f a driver lacks both the willful intent and the ability to comply with the statute at the scene, compliance at the scene should be held to be a factual impossibility."

We agree with *Flores* and find defendant's argument unpersuasive. As the People point out, "[i]mplicit in [defendant's] argument is that if [a] driver is unable to perform the requisite duties at the scene, then those duties simply cease to exist. That is not, and cannot be, the law." As noted, Vehicle Code section 20004 requires a driver to report an accident resulting in death, and to provide the information required by section 20003, "without delay" if there is no traffic or police officer at the scene to whom to give the information required by Vehicle Code section 20003. Vehicle Code section 20001 requires a driver involved in an injury accident to "immediately stop" at the scene of the accident *and* fulfill the requirements of Vehicle Code sections 20003 and 20004.

As *Flores* observed, the statutes place no time limit on the driver's duty to comply with Vehicle Code sections 20003 and 20004, if the driver is injured or otherwise unable to comply with Vehicle Code section 20003 *at the scene*. (*Flores*, *supra*, 51 Cal.App.4th

20

at p. 1204.)  Thus, the driver's injuries or other incapacitation at the scene do not excuse the driver from complying with the reporting requirements of Vehicle Code section 20003 and, if applicable, of Vehicle Code section 20004, as soon as it is reasonably possible for the driver to do so after the accident.  (*Id*. pp. 1201, 1205-1206.)

B.  *The Trial Court Properly Imposed the Upper Term on Count 2*

On March 30, 2022, the trial court sentenced defendant to the upper term of four years on count 2, the principal count.  Defendant claims the judgment must be reversed and the matter remanded for resentencing on count 2 because the record does not show that the court found true beyond a reasonable doubt the aggravating factors it relied on in imposing the upper term.  (See Pen. Code, § 1170, subd. (b)(2).)  We affirm the upper term sentence on count 2.

1.  Legal Principles

Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) (Senate Bill No. 567) amended Penal Code section 1170, subdivision (b) (section 1170(b)), effective January 1, 2022. When a criminal offense is punishable by three possible terms, section 1170, subdivisions (b)(1) and (b)(2) (section 1170(b)(1), (b)(2)), require the court to sentence the defendant to the middle term, unless circumstances in aggravation justify imposing the upper term, and the facts underlying the circumstances in aggravation have either been (1) stipulated

21

to by the defendant, or (2) found true beyond a reasonable doubt at trial by the trier of fact. (*People v. Fox* (2023) 90 Cal.App.5th 826, 830-831.)[4]

Section 1170, subdivision (b)(3) (section 1170(b)(3)), provides for an exception to section 1170(b)(1) and (b)(2). It provides: "Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170(b)(3).) Thus, a court may impose the upper term, based on a certified record of a prior conviction, without finding, or requiring the trier of fact to find, the fact of the prior conviction true beyond a reasonable doubt. (*Ibid.*) The court is required to "set forth on the record the facts and reasons for choosing the sentence imposed." (§ 1170, subd. (b)(5) (section 1170(b)(5).)

2. Sentencing

Defendant did not stipulate to any factors in aggravation of his sentence on count 2. Thus, at sentencing on March 30, 2022, the trial court was authorized to impose the upper term of four years on count 2 only if the court, which sat as the trier of fact at

---

[4] Section 1170(b)(1) provides: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." Section 1170(b)(2) provides in part that, "[t]he court may impose sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

defendant's trial, found true beyond a reasonable doubt circumstances in aggravation, justifying the upper term. (§ 1170(b)(2); Stats. 2021, ch. 731, § 1.3)

At sentencing, the trial court said it had reviewed the probation officer's report, the People's sentencing recommendation, and the court's own thoughts, recollections, and notes from the trial. The court stated that, "[b]ased on the totality of the circumstances," the court "concur[red] completely" with the probation officer's recommendation to impose the upper term of four years on count 2. The court agreed with the probation officer that there were no mitigating circumstances favoring defendant. (California Rules of Court, rule 4.423(a).)[5]

The court also said it was following rule 4.421(a) [aggravating factors relating to the crime] and rule 4.421(b) [aggravating factors relating to the defendant], and cited five factors in aggravation in imposing the upper term: the victim was "particularly vulnerable" (rule 4.421(a)(3)); the crime involved great violence and a high degree of callousness (rule 4.421(a)(1)); defendant posed a danger to society (rule 4.421(b)(1)); defendant's convictions as an adult were increasing in seriousness (rule 4.421(b)(2)); and defendant was on felony probation at the time the crime was committed (rule 4.421(b)(4).)

3. Analysis

Defendant claims he is entitled to be resentenced on count 2 because the court did not expressly state on the record that it was finding true beyond a reasonable doubt any of

---

[5] Unspecified references to rules are to the California Rules of Court.

the aggravating factors it relied on in imposing the upper term. Defendant claims "it appears" the court failed to find any of the aggravating circumstances it relied true beyond a reasonable doubt, and the absence of a record establishing compliance" with Senate Bill No. 567 requires a new sentencing hearing on count 2.

The People argue defendant has forfeited these claims by failing to raise them in the trial court. Further, the People argue the trial court was not required to state on the record that it was finding any of the aggravating factors true beyond a reasonable doubt. The People claim the court "was presumably aware of, and followed" Senate Bill No. 567. We agree with the People.

First, defendant forfeited his challenge to the upper term sentence on count 2, by failing to ask the trial court to clarify whether it was finding any or all of the aggravating factors it relied on in imposing the upper term true beyond a reasonable doubt. The forfeiture doctrine "appl[ies] to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (*People v. Scott* (1994) 9 Cal.4th 331, 351-353.) Defendant's claim of sentencing error is based solely on the trial court's failure to state on the record that the court was finding true beyond a reasonable doubt each aggravating factor it relied on in imposing the upper term. This is precisely the type of sentencing error that is forfeited unless raised in the trial court. (*Id*. at pp. 351-353.) "Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention." (*Id*. at p. 353.)

Second, the court was *not* required to state on the record that it was finding the aggravating circumstances it relied on in imposing the upper term true beyond a

reasonable doubt. Rather, the court was only required to "set forth on the record the facts and reasons for choosing the sentence imposed." (§ 1170(b)(5).) Rule 4.406 has long provided that when, as here, "the sentencing judge is required to give reasons for a sentence choice, the judge must state in simple language the primary factor or factors that support the exercise of discretion. The statement need not be in the language of the statute or these rules." (Rule 4.406 (a).) The trial court complied with section 1170(b)(5) and rule 4.406 by stating, on the record, each aggravating factor the court was relying on in imposing the upper term, without expressly stating that the court was finding any of those aggravating factors true beyond a reasonable doubt.

Third, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) The record contains no indication that the trial court was unaware of the requirements of section 1170(b), as amended by Senate Bill No. 567, effective January 1, 2022, when it imposed the upper term at sentencing on March 30, 2022. Thus, we presume that the court knew of and correctly applied section 1170(b), as amended by Senate Bill No. 567, effective January 1, 2022.

C. *Defendant's Indeterminate Abstract of Judgment Must Be Corrected on Remand*

The parties agree that the abstract of judgment for defendant's indeterminate sentence of 15 years to life on count 1 is in error and must be corrected to show that defendant was convicted of *second* degree murder, not first degree murder, as the current abstract indicates. A court has inherent authority to correct clerical errors in court records, including in abstracts of judgment, in order to make the records reflect the true

25

facts.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Mgebrov* (2008) 166 Cal.App.4th 579, 594-595.)  Thus, we remand the matter to the trial court with directions to prepare a corrected indeterminate abstract of judgment.

## IV.  DISPOSITION

The matter is remanded to the trial court with directions to prepare a corrected abstract of judgment, for defendant's indeterminate sentence of 15 years to life on count 1, to show that defendant was convicted of second degree murder, not first degree murder, in count 1.  The court is further directed to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  The March 30, 2023 judgment of conviction and sentence is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
                                                                                          J.

We concur:


McKINSTER
            Acting P. J.


RAPHAEL
                        J.

26